# EXHIBIT  1

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
NEOLOGY, INC., a Delaware and California corporation; BRADLEY H. FELDMANN, a California individual; OEP Capital Advisors, L.P., a Delaware limited partnership; OEP Neology Cayman, L.P. a Cayman Islands limited partnership; OEP VI General Partner, L.P. a Cayman Islands limited partnership; and DOES 1 through 50, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JOSEPH N. MULLIS, a California individual,

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

9/25/2025 3:51:12 PM

Clerk of the Superior Court
By M. Ramirez    ,Deputy Clerk

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

---

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California, for the County of San Diego
330 W. Broadway
San Diego, California 92101

CASE NUMBER:
*(Número del Caso):*
**25CU051830C**

---

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Joseph N. Mullis, Pro Se
1152 Breakaway Drive
Oceanside, California 92057

DATE:
*(Fecha)* September 29, 2025

Clerk, by *(Secretario)* M. Ramirez , Deputy *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)        ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joseph N. Mullis, *Pro Se*
1152 Breakaway Drive
Oceanside, California 92057
joenmullis@gmail.com

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

9/25/2025 3:51:12 PM

Clerk of the Superior Court
By M. Ramirez        ,Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO

JOSEPH N. MULLIS, a California
individual,

          Plaintiff,

   v.

NEOLOGY, INC., a Delaware and
California corporation; BRADLEY H.
FELDMANN, a California individual; OEP
Capital Advisors, L.P., a Delaware limited
partnership; OEP Neology Cayman, L.P. a
Cayman Islands limited partnership; OEP
VI General Partner, L.P. a Cayman Islands
limited partnership; and DOES 1 through
50, inclusive,

          Defendants.

Case No.   25CU051830C

**COMPLAINT FOR:**

1. **Breach of Written Contract (Severance and Pro-Rata Bonus)**
2. **Breach of Written Contract (MEP-Underpayment of Vested Equity)**
3. **Failure to Pay Earned Wages (Bonus and Vested Equity) (Lab. Code §§ 200–204), Waiting-Time Penalties (Lab. Code § 203), and Attorneys' Fees (Lab. Code § 218.5)**
4. **Breach of Written Contract (Pari-Passu Co-Investment Right)**
5. **Fraud (Promissory Fraud)**
6. **Promissory Estoppel (Pari-Passu Co-Investment Right)**
7. **Breach of the Implied Covenant of Good Faith and Fair Dealing**
8. **Retaliation for Asserting Rights (Lab. Code § 98.6) and Whistleblower Retaliation Lab. Code §§ 1102.5, 1102.6)**
9. **Declaratory Relief (CCP § 1060) — MEP Valuation/Rights and Pari-Passu Obligations**
10. **Conversion**
11. **Civil Theft (Penal Code § 496 (a), (c))**
12. **Unfair Competition (Bus. & Prof. Code § 17200 et seq. — "Unlawful," "Unfair," and "Fraudulent" Prongs)**
13. **Common Counts (Money Had and Received; Money Paid/Assumpsit)**

**JURY TRIAL DEMANDED**

**PRELIMINARY STATEMENT**

This action is brought by Joseph N. Mullis ("Plaintiff" or "Mr. Mullis"), a former executive of Neology, Inc., against Neology and OEP Capital Advisors, L.P., OEP Neology Cayman, L.P., OEP VI General Partner, L.P. (the OEP entities are collectively referred to as "OEP"), and Does 1-50 (collectively, all defendants are referred to as "Defendants")

Mr. Mullis devoted nearly two decades to Neology. He did so on the promise that he would be treated like a true partner in the success he helped create. When OEP acquired Neology in 2017, that promise was formalized through a new compensation framework. In exchange for continuing his leadership role, Mr. Mullis was offered the opportunity to invest in the company on equal terms with the sponsor, known as a pari passu co investment.

Mr. Mullis accepted the revised compensation terms and continued to serve as General Manager – US, and a key member of the executive team as well as a director at Neology. Over the next five years, internal documents, financial models, and discussions confirmed that a co-investment was anticipated. Mr. Mullis was identified as one of the few executives slated to participate in the management equity program. Despite these representations, Defendants never provided a subscription agreement, funding opportunity, or other actionable means for Mr. Mullis to participate. The promise remained unfulfilled.

When Mr. Mullis asked Defendants why Mr. Mullis was not given what was due during his employment, Defendants responded with silence. Then, not long thereafter, Defendants terminated Mr. Mullis's employment. The termination was allegedly not for cause. It was communicated as part of a restructuring. But as to the benefits he was owed, including six months of severance pay, a prorated annual bonus, and others, Defendants failed to honor. Instead, they delayed, evaded, and withheld what was owed.

Defendants moreover did not pay any vested equity at termination. Rather, they further undervalued and underpaid Mr. Mullis for the equity he had already earned. Internal documents placed the value of his equity at approximately $524,807. Defendants instead paid him only $185,000 and classified the payment in a way that increased his personal tax liability. Defendants never remitted the shortfall or paid statutory interest thereon.

As if that were not enough, in what can only be viewed as show of spite, malice, and ill will, Defendants continued to use Mr. Mullis's personal credit card, which had previously been placed on file for corporate expenses, after his termination, for several months. Mr. Mullis demanded that the card be removed and that all personal charges be reimbursed. Defendants promised to remove the card immediately following his termination. They did neither in a timely manner and continued to use the card for several months. And even after paying the initial sums, Defendants continued the malice and spite. In fact, as of September 16, 2025, Defendants had incurred additional unauthorized charges on the credit card.

Mr. Mullis seeks to hold Defendants accountable. Their conduct violated multiple provisions of the Labor Code, breached express and implied contractual obligations, and constituted fraud, concealment, and conversion. It also ran afoul of California's Unfair Competition Law. Mr. Mullis seeks relief, including, but not limited to, full compensatory and other damages, restitution, penalties, and injunctive relief.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this matter because the claims arise under California law and the amount in controversy exceeds the jurisdictional minimum of this Court for an unlimited civil case, and the parties are located in, reside in, and/or conduct business in San Diego County.

2.     Venue is proper in this Court under Code of Civil Procedure section 395 because Defendants do business in this County, Plaintiff resides in this County, and many of the acts and omissions giving rise to the injury to Plaintiff in this County as alleged in this Complaint occurred in this County.

## PARTIES

3.     Plaintiff Joseph N. Mullis is an individual residing in the State of California. At all relevant times, Mr. Mullis served as the General Manager – US, and as Director, and performed services for Defendants within the State of California. At all relevant times, Plaintiff primarily worked and resided in the State of California.

/ / /

4.      Defendant Neology, Inc. is, on information and belief, a corporation incorporated under the laws of the State of Delaware and with its principal place of business in California at 1917 Palomar Oaks Way, Suite 110, Carlsbad, CA 92008. Neology is a citizen of California and does business throughout California, including in San Diego County, where many relevant events occurred.

5.      Defendant Bradley H. Feldmann is, on information and belief, an individual residing in California who, at all relevant times, served as Neology's Chief Executive Officer and Chairman and acted as a managing agent exercising control over wages, hiring/firing, and payroll practices; he directed, authorized, and/or ratified the unlawful conduct alleged herein, personally negotiated and/or approved the contracts at issue, made or caused to be made material misrepresentations and concealments, and operated Neology as his alter ego such that recognizing the corporate form would sanction a fraud or promote injustice. Accordingly, Mr. Feldmann is personally liable for the violations alleged.

6.      Defendant, OEP Capital Advisors, L.P. ("OEP Capital") is, on information and belief, a Delaware limited partnership with its principal place of business at 330 N Wabash Avenue, Chicago, Illinois.

7.      Defendant OEP Neology Cayman, L.P. is, on information and belief, a limited partnership formed and registered in the Cayman Islands.

8.      Defendant OEP VI General Partner, L.P. is, on information and belief, a limited partnership formed and registered under the laws of the Cayman Islands.

9.      Upon information and belief, each of DOES 1 through 50 constitutes a legal employer or is otherwise legally responsible in some manner for the acts and omissions alleged herein. This Complaint may be amended to reflect their true names and capacities once ascertained.

10.     On information and belief, at all relevant times Defendants' officers, the Board of Directors, and Board committees and subcommittees (including any compensation, valuation, audit, or special committees) acted under authority conferred and limited by Defendants' corporate charters, bylaws and related governance documents,

including all amendments, restatements, and committee charters, as well as policies and procedures governing the subjects of this action.

11.    On information and belief, each Defendant was the agent, servant, employee, partner, joint venturer, co conspirator, alter ego, subsidiary, parent, successor in interest, and or representative of each other Defendant, and at all relevant times was acting within the course and scope of that relationship, and authorized to do so.

12.    On information and belief, each Defendant acted with the knowledge, consent, and ratification of the other Defendants, including by formulating and implementing policies relating to Plaintiff's employment, compensation, termination, and post termination entitlements.

13.    On information and belief, at least some of the Defendants have common ownership, common management, interrelationship of operations, and centralized control over labor relations and are therefore part of an integrated enterprise and thus jointly and severally responsible for the acts and omissions alleged herein, with shared decision making regarding executive compensation, employment terms, and co investment structures.

14.    On information and belief, the separation of ownership, decision making, and capitalization between Defendants is a mere sham and Defendants should be treated as alter egos for purposes of this action.

## FACTUAL BACKGROUND

15.    Mr. Mullis served Defendants for nearly two decades, rising to the role of General Manager – US and a member of the Board of Directors of Neology, and playing a critical leadership role in integrating company operations, developing strategic partnerships, and assigning over fifty patents to Neology as part of his service.

16.    In or around 2014, Mr. Mullis entered into a written Employment Agreement with Neology. That agreement included, among other terms, a promise of six months' severance if terminated without cause, and an annual performance-based bonus. This agreement governed the parties' relationship until a significant shift occurred in 2017.

17.    In 2017, OEP acquired Neology. In connection with that acquisition, Mr.

Mullis was presented with updated employment terms that materially altered the economics of his role. These revised terms reaffirmed the severance and bonus structure of his original agreement, but added new, long-term compensation components specifically designed to reward executive loyalty and incentivize growth. As part of the updated terms, Mr. Mullis was offered both participation in a Management Equity Plan ("MEP") and a direct co-investment right "pari passu" with OEP itself.

18.    This offer was communicated in writing. Specifically, on August 16, 2017, at 2:42 a.m., OEP principal Joerg Zirener sent an email to Mr. Mullis, with a copy to Neology's Chief Executive Officer Francisco Martinez de Velasco, stating: "we would propose to raise your fix comp from $210k to $250k and your bonus from $70k to $100k. In addition you will receive 1.5% of the MEP pool. Furthermore, we will offer you the opportunity to directly co-invest pari-passu to OEP into Neology." The message asked for a green light to "install as of September," making clear that these revised terms were intended to take effect imminently.

19.    Mr. Mullis responded to the offer on August 19, 2017, signaling his interest in the opportunity and his readiness to proceed. In his reply, Mr. Mullis stated: "I would like to invest in the pari-passu, but I really don't have any details. Is this something that is a work in process or is there something to consider? What % of the pool will be appropriated or is this open?" In the same message, he also raised related employment terms, such as vesting, severance, and board seat matters.

20.    Zirener replied on August 21, 2017, confirming that while certain structuring details remained in progress, the overall architecture of the co-investment was well developed. He wrote: "Details work in progress, but overall picture clear … We are thinking about a $1.5mm total pool for Frank, Paul, Francisco, Mahesh, Seishi and you." He also confirmed that Mr. Mullis's role on the board would remain in place and promised to circulate a new standard contract. At that point, Mr. Mullis accepted the revised offer and continued his employment in reliance on the promises made.

21.    He complied with his obligations under his employment agreement, including

- 6 -

assigning his patents to Neology, and he relied on the promised long-term investment opportunities of the pari passu and the MEP in deciding to continue his employment. He even agreed to avail his credit card for expenses the company needed but was unable to meet at certain times during his employment.  Consistent with the August 2017 offer, Neology increased Mr. Mullis's compensation and proceeded to implement other components of the arrangement, including a later increase of his bonus to $150,000.

22.    On information and belief, on or around September 6, 2018, Neology's then CEO Francisco Martinez sent Zirener an Excel spreadsheet titled "Pari Passu calculations.xlsx," which set forth proposed investment allocations for the team. The spreadsheet included Mr. Mullis as a participant and modeled funding through I+D, with "individual severances and bonuses as collateral guaranty," a team allocation totaling $1.5 million, and responsibility for servicing annual net interest of approximately $80,000. This email and spreadsheet reflected Defendants' affirmative confirmation of the pari-passu terms; the very terms Mr. Mullis had accepted and performed under.

23.    Despite these clear confirmations, and despite Mr. Mullis's continued efforts to express willingness and ability to participate, Defendants never followed through with the promised investment opportunity. No subscription documents or formal invitations were issued. Mr. Mullis raised the issue on several occasions, but years passed without action. Then, in March 2022, Mr. Mullis once again raised the issue to Neology leadership, including Feldmann, Padgett, and Martinez, writing that "Sheshi, Francisco, and I would be entitled to participate in the Pari-Passu as part of our employment contract." He reiterated his continued interest and noted that the Compensation Committee had been considering the matter "for some time." Still, Defendants never provided him the chance to participate.

24.    Regarding the MEP, on March 25, 2022, Neology's Chief Financial Officer, Charles Padgett, provided written documentation showing Mr. Mullis's MEP shares and a per-share valuation of $378,863 as of December 31, 2021. That same day, Mr. Mullis emailed Chief Executive Officer Brad Feldmann, President Francisco Martinez, and CFO Padgett, pointing out that the vesting schedule applied was incorrect by one year. This

- 7 -

correction equated to an additional 20% vesting and therefore increased the value of his equity. Neology management did not dispute the valuation provided. Instead, Padgett engaged Neology's outside counsel, Freshfields, to address the vesting schedule. Freshfields subsequently confirmed the correction, which only increased Mr. Mullis's entitlement. At no point was the valuation presented by Padgett retracted or disputed.

25.     As a result of the corrected schedule, Mr. Mullis reached 100% vesting by July 2022. Using Defendants' own valuation as of December 31, 2021, the value of his vested shares was $524,807. In other words, Defendants provided written documentation confirming that Mr. Mullis' equity interests under the MEP had vested and were valued at $524,807 mere months before his termination. This was not a speculative figure. It was based on actual vesting and internal performance metrics calculated by and affirmed by Defendants and communicated directly to Mr. Mullis.

26.     Not long after Mr. Mullis raised renewed questions about Defendants' contractual obligations to him, Defendants terminated his employment. The purported reason was a company restructuring, but the facts raise significant questions. Only ten individuals were terminated as part of the "restructuring," nine of whom were protected under at least the Older Workers Benefit Protection Act and the federal Age Discrimination in Employment Act of 1967 (as amended) (the "ADEA"). Most notably, despite citing "restructuring," Defendants filled Mr. Mullis's position almost immediately. Less than two months later, on November 21, 2022, Neology publicly announced the hiring of his direct replacement, Mr. Steve Haddix. This rapid replacement illustrates that Defendants' proffered explanation for Mr. Mullis's termination was pretextual.

27.     At the time of his termination, Mr. Mullis had earned a pro-rata bonus of approximately $112,192.  His eligibility for this bonus was confirmed by Neology's Joseph Averkamp, who now serves as an Independent Board Member, in an August 15, 2022 text message stating that Mr. Mullis was the only General Manager on track to meet his goals that year. Because Mr. Mullis was terminated without cause, he was also entitled under the employment agreement to six months of severance; an amount that would have totaled

approximately $128,750. On information and belief, others received bonuses that year, despite Averkamp suggesting that none were on track to meet their targets that year.

28.     Instead of honoring their obligations, Defendants sought to "wipe the slate clean" by presenting Mr. Mullis with a separation agreement that would have forced him to give up nearly everything he had earned. Under the proposed agreement, Mr. Mullis would have forfeited, among other things, his earned and accrued bonus confirmed at least a month earlier, his rights to the pari-passu investment, and the MEP benefits that had already fully vested (*which Defendants expressly acknowledged unambiguously post-termination; even though they engaged in other bad conduct in relation thereto*). Mr. Mullis declined to sign.

29.     In the September 26, 2022 communication, Defendants informed Plaintiff that his termination date would be September 30, 2022. In an effort to arm-twist Defendant into giving up rights to and benefits he was owed, and as a further illustration that Defendants' alleged "restructuring" was indeed a mere pretext, in the separation agreement, Defendants also "dangled" a "consulting agreement" which would be effective on October 3, 2022 (3 days after the termination date identified in the separation agreement) only if Plaintiff signed the separation agreement and release and effectively gave up protections under law. In other words, instead of granting the authorized 21 days to consider the release under ADEA, Defendants effectively asked Plaintiff to sign the release immediately if he wanted an opportunity to work with Defendants further as a consultant.

30.     Following Defendants' attempt to extinguish their obligations through the separation agreement, Mr. Mullis made a demand on Defendants in or around September 2022 to honor the terms of the agreement. On September 29, 2022, Defendants' counsel responded by denying the existence of any separate pari-passu investment right. At the same time, counsel explicitly acknowledged the MEP equity, though curiously avoided reference to the confirmed valuation of $524,807 explicitly stated in Defendants' own records.

31.     Rather than pay the value that had been established and acknowledged months prior regarding the MEP, Defendants unilaterally determined the "fair market value" of Mr. Mullis' equity interests was ($0) therefore unilaterally reducing the payout to $185,000 – a

"floor" amount based on a purported side agreement.  In response, Mr. Mullis, through counsel, objected, reminding Defendants of Defendants' own valuations and their own confirmation of the true value of his equity interests shortly before his termination.

32.    Mr. Mullis, through counsel, requested the relevant information to ascertain the valuation that Defendants unilaterally came up with.  Defendants refused to provide the requested calculations or to substantiate the $0.00 valuation.  Mr. Mullis specifically informed Defendants that they could not unilaterally offer a substantially reduced value for his equity interests several months after his termination, and then refuse to provide him with the necessary information to ascertain the unilaterally-set value.

33.    Still, Defendants offered no substantive explanation for the nearly $339,807 shortfall between the documented valuation and the amount paid. Making matters worse, Defendants treated the $185,000 as W-2 income rather than capital gain, thereby subjecting Mr. Mullis to an unnecessary tax burden of more than $24,420. This tax harm was entirely avoidable and flowed from Defendants' decision to disregard their own prior commitments.

34.    Mr. Mullis made clear to Defendants that he did not accept this forced "resolution" and that he reserved all rights. As of April 1, 2023, the unpaid shortfall had accrued statutory interest of at least than $79,500, bringing total exposure to over $443,700. This number continues to grow.

35.    Adding insult to injury, Defendants also misused Mr. Mullis's personal credit card during and after his employment. While employed, Mr. Mullis had authorized use of the card for corporate purposes based on his belief that Defendants would honor its promises to him.

36.    On September 27, 2022, Mr. Mullis emailed Neology's Susan Peabody, expressly instructing the company to discontinue use of credit card for any further business purposes. Ms. Peabody responded that same day, confirming that the company had stopped using the credit card.

37.    Despite this assurance, Defendants continued to use Mr. Mullis's personal credit card, improperly charging more than $70,000 over the course of several months.

Defendants' written acknowledgment that use of the card would cease illustrates the deliberate nature of the misconduct. Although Defendants ultimately reimbursed Mr. Mullis initially for the underlying expenses, they repeatedly failed to do so on time, forcing him to personally advance substantial funds for corporate expenses well after his termination for several months.  But even after appearing to stop use of the credit card, in September 2025, Mr. Mullis discovered that Defendants had continued to charge his credit card.

38.    On information and belief, the United States Securities and Exchange Commission ("SEC") issued an Order against OEP, imposing a cease-and-desist, censure, and a $4,000,000 civil penalty on OEP for among other things, making "claims based on estimated, current valuations of the OEP Funds' portfolio holdings, which had not been approved by OEP's valuation committee."

39.    Defendants' handling of Plaintiff's compensation and equity was consistent with the practices identified in the SEC Order. Specifically, the SEC's finding that OEP personnel disseminated valuation-based claims outside of committee-approved processes supports an inference that Defendants here disregarded internal valuation controls when they unilaterally paid Plaintiff $185,000 against a written vested valuation of $524,807 and withheld the balance.

40.    The SEC-identified practice of using unapproved valuation narratives in marketing communications is probative of Defendants' bad faith and unfair practices toward Plaintiff, including conditioning payment obligations on terms not found in the governing documents, denying the existence of Plaintiff's pari-passu co-investment right after promising it, and mischaracterizing payments in a manner that reduced their value to Plaintiff.

41.    Plaintiff is informed and believes, and thereon alleges, that between Plaintiff's first date of employment and Plaintiff's last date of employment, Defendants maintained and amended one or more versions of the charters, bylaws, and documents governing (a) each of Defendants' operations; (b) officer authority to set and modify compensation and severance; (c) adoption and administration of equity plans; (d) valuation

- 11 -

processes; (e) approvals required for executive terminations and employment-related payments; (f) other matter relevant to the governance of each of Defendants.

42.     On information and belief, Defendants' respective corporate charters, bylaws, other governing documents, and other relevant documents, including the specific policies and procedures relevant to the subjects herein, did not authorize the challenged conduct herein; and to the extent any provision could be construed to authorize it, such provision violated applicable law, and/or was unconscionable, or at a minimum, Defendants exceeded any permissible scope and acted in violation of the very documents and applicable law.

43.     Any applicable statute of limitations is tolled, deferred, or estopped because the operative facts were not reasonably discoverable until late 2022–2023 and Defendants induced forbearance. For example, on September 29, 2022, Defendants' counsel first denied any "separate pari-passu investment," and only months after termination Defendants made an unsolicited $185,000 deposit inconsistent with the written valuation, without explanation; conduct that concealed the underpayment and reasonably led Plaintiff to expect correction without litigation. During the same period, despite Plaintiff's objections, Defendants continued post-termination charges on Plaintiff's personal credit card, further masking the full extent and timing of harm. Plaintiff acted diligently by demanding payment, objecting to the unauthorized charges, and seeking documents, while key information (bylaws/charters, valuation models, committee approvals, and payment mechanics) remained within Defendants' exclusive control. Defendants' assurances, partial payment, denials, promises to resolve the disputes informally, and withholding equitably estop them from asserting limitations, and their ongoing retention of specific, identifiable sums (the unpaid vested-equity balance and earned bonus) and recurring card charges constitute continuing conversion/withholding and continuous accrual such that each nonpayment and charge within the limitations period is independently actionable.

44.     This is not a case of unclear agreements or mistaken obligations. The pari-passu rights were expressly promised and confirmed. The MEP equity was fully vested and valued. The severance and bonus were contractually required and Mr. Mullis had earned

them lawfully. Neology and OEP chose to ignore these obligations and retaliated against Mr. Mullis for asserting them. Their conduct was deliberate, knowing, and in bad faith. This lawsuit follows as a last resort, after patience and extensive efforts at informal resolution, to obtain the compensation, equity, and redress that Mr. Mullis is lawfully owed.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Breach of Written Contract (Severance and Pro-Rata Bonus)

(Against All Defendants)

45.     Plaintiff realleges all relevant prior paragraphs as though set out here.

46.     In or around 2014, Plaintiff and Neology entered into a written Employment Agreement that included, among other terms, six months of severance if Plaintiff was terminated without cause and an annual bonus opportunity. In 2017, after OEP acquired Neology, Defendants presented updated terms that reaffirmed Plaintiff's severance and bonus rights.

47.     Plaintiff performed under the Employment Agreement through his termination in or about September 2022. As of August 2022, Neology executive Joseph Averkamp confirmed that Plaintiff was the only General Manager on track to meet his goals. At the time of termination, Plaintiff had accrued a pro-rata bonus of approximately $112,192.00.

48.     Plaintiff was terminated purportedly without cause. Under the Employment Agreement, six months of severance became due, which Plaintiff estimates at approximately $128,750.00. The Employment Agreement did not require Plaintiff to sign a separation or release agreement that forfeited earned compensation or other rights and benefits Plaintiff had lawfully earned or secured and that had not yet been paid, delivered or provided by Defendants in order for Plaintiff to receive severance or any earned bonus.

49.     All conditions required for Defendants' performance occurred or were excused. Plaintiff did all, or substantially all, of the significant things the Employment Agreement required of him, or he was excused from doing so.

- 13 -

COMPLAINT

50.     Defendants did not pay Plaintiff the six months of severance owed at separation. Defendants also did not pay Plaintiff the earned pro-rata bonus of approximately $112,192.00 at separation, and instead sought to condition payment obligations on an onerous release that was not part of the Employment Agreement and that required Plaintiff to forfeit other earned interested including vested equity interests.

51.     Defendants' failures to pay severance and the earned pro-rata bonus are breaches of the written Employment Agreement. These breaches caused Plaintiff harm, including the unpaid severance and bonus amounts and associated consequential losses. Defendants' breaches were a substantial factor in causing Plaintiff's harm.

### SECOND CAUSE OF ACTION

### Breach of Written Contract (MEP-Underpayment of Vested Equity)

(Against All Defendants)

52.     Plaintiff realleges all relevant prior paragraphs as though set out here.

53.     As alleged above, Plaintiff was offered as part of his employment and indeed participated in a management equity plan ("MEP"). In early 2022, Defendants provided documentation to Plaintiff showing that his vested MEP equity was valued at $524,807. The MEP and Defendants' written valuation reflect a contractual obligation to pay Plaintiff the vested amount in accordance with the plan's terms.

54.     Plaintiff met the plan's vesting requirements and otherwise performed all, or substantially all, obligations required of him under the MEP, or any nonperformance was excused.

55.     All conditions required for Defendants' performance occurred or were excused. Plaintiff requested payment consistent with the vested valuation.

56.     Defendants did not pay the vested MEP amount reflected in the written valuation. Instead, Defendants unilaterally paid $185,000 and withheld the remaining balance, without a written modification agreed to by Plaintiff and without tendering the full vested amount, or a substantial explanation and justification of the reduced payout.

57.     Defendants' failure to pay the vested MEP amount in full is a breach of the

- 14 -

written contract governing Plaintiff's MEP rights.

58.     As a result of the breach, Plaintiff suffered harm, including at least the unpaid balance between the $524,807 vested valuation and the $185,000 paid, together with additional consequential losses, including increased tax burden caused by Defendants' payment treatment, and other damages to be proven at trial. Defendants' breach was a substantial factor in causing Plaintiff's harm.

**THIRD CAUSE OF ACTION**

**Failure to Pay Earned Wages (Bonus and Vested Equity) (Lab. Code §§ 200–204),**

**Waiting-Time Penalties (Lab. Code § 203), and Attorneys' Fees (Lab. Code § 218.5)**

(Against All Defendants)

59.     Plaintiff realleges all relevant prior paragraphs as though set out here.

60.     At all relevant times, Defendants employed Plaintiff within the meaning of the California Labor Code. Plaintiff performed labor for Defendants through his termination in or about September 2022.

61.     Under Labor Code section 200, subdivision (a), "wages" include all amounts for labor performed by an employee, whether fixed or based on a percentage or other method of calculation. As alleged above, Plaintiff earned (a) an annual bonus that was determinable and accrued on a pro-rata basis as of his termination (approximately $112,192.00), and (b) equity compensation that had vested and was valued in writing by Defendants in early 2022 at $524,807, which was payable in cash or its equivalent. These amounts were "wages" within the meaning of section 200 because they were compensation earned for Plaintiff's services and determinable as of separation.

62.     Labor Code sections 201–204 required Defendants to pay all earned and unpaid wages no later than the time required by law. Because Plaintiff was discharged, section 201 required immediate payment of all earned wages at the time of termination.

63.     Plaintiff satisfied all conditions necessary to earn the pro-rata bonus and to vest in his equity compensation, or any remaining conditions were excused. As of August 2022, Neology executive Joseph Averkamp confirmed Plaintiff was the only General

- 15 -

Manager on track to meet his goals, and in early 2022 Defendants provided written documentation valuing Plaintiff's vested MEP equity at $524,807.

64.    Defendants did not pay Plaintiff, at the time of termination, the earned pro-rata bonus. Defendants also did not pay, at the time of termination, the cash value of Plaintiff's vested equity compensation reflected in Defendants' written valuation. Months later, Defendants unilaterally paid only $185,000 toward the vested equity and did not pay the balance, leaving a shortfall of the difference between $524,807 and $185,000.

65.    Defendants' failure to pay all earned wages consisting of the pro-rata bonus and the vested equity value when due violated Labor Code sections 201–204.

66.    Defendants' failure to pay all earned wages at separation was willful within the meaning of Labor Code section 203. Defendants possessed and communicated the relevant bonus and vesting information before termination; they had valued Plaintiff's vested equity in writing; and they nevertheless withheld timely payment and later paid only a portion of the vested amount without a written modification agreed to by Plaintiff.

67.    As a result of the willful failure to pay all wages due at separation, Plaintiff is entitled to waiting-time penalties under Labor Code section 203 in an amount equal to his daily wage rate for up to thirty (30) days, in an amount to be proven at trial.

68.    Plaintiff has suffered harm, including but not limited to the unpaid pro-rata bonus, the unpaid portion of the vested equity compensation, statutory waiting-time penalties, and prejudgment interest on liquidated sums.

69.    This action is brought for the nonpayment of wages. Pursuant to Labor Code section 218.5, Plaintiff, as the prevailing employee, is entitled to an award of reasonable attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**

**Breach of Written Contract / Implied In Fact Contract (Pari-Passu Co-Investment Right)**

(Against All Defendants)

70.    Plaintiff realleges all relevant prior paragraphs as though set out here.

- 16 -

71.     As alleged above, in 2017 Defendants communicated in writing that Plaintiff would have the opportunity to directly co-invest in Neology on the same terms as OEP (pari passu), and identified a team pool for that co-investment. Defendants later circulated internal materials modeling individual allocations.

72.     Plaintiff accepted and continued his employment in reliance. Defendants implemented the updated compensation and proceeded with planning for the pari-passu allocation.

73.     Plaintiff alleges that the writings described above constitute a contract granting him the opportunity to subscribe for his pari-passu allocation on the sponsor's terms, with any remaining mechanics to be finalized within a reasonable time.

74.     Plaintiff did all, or substantially all, that the contract required of him, or was excused. He remained ready, willing, and able to subscribe. Any conditions precedent were within Defendants' control and occurred or were excused.

75.     Defendants failed to tender subscription documents or otherwise provide Plaintiff the promised opportunity to subscribe within a reasonable time, despite notice and requests.

76.     As a result, Plaintiff was deprived of the opportunity to obtain the pari-passu interest and the economic value that interest would have provided. Defendants' failure to tender the subscription was a substantial factor in causing Plaintiff's harm.

**FIFTH CAUSE OF ACTION**

**Fraud (Promissory Fraud)**

(Against All Defendants)

77.     Plaintiff realleges all relevant prior paragraphs as though set out here.

78.     As alleged above, on August 16, 2017 at 2:42 a.m., OEP principal Joerg Zirener wrote to Plaintiff, copying Neology's CEO, stating: "we would propose to raise your fix comp from $210k to $250k and your bonus from $70k to $100k. In addition you will receive 1.5% of the MEP pool. Furthermore, we will offer you the opportunity to directly co-invest pari-passu to OEP into Neology," and asked for a "green light" to "install

as of September."

79.    On August 21, 2017, Zirener followed with: "Details work in progress, but overall picture clear … We are thinking about a $1.5mm total pool for Frank, Paul, Francisco, Mahesh, Seishi and you," and stated that a "new standard contract" would follow.

80.    On September 6, 2018, Neology's CEO circulated "Pari Passu calculations.xlsx" to "structure the investment per individual," identifying a $1.5 million team allocation, proposing funding through I+D with "individual severances and bonuses as collateral guaranty," and assigning responsibility for "paying the annual net interest on the I+D loan (~$80K/yr in total)."

81.    In the alternative, when Defendants made the above promises to give Plaintiff "the opportunity to directly co-invest pari-passu to OEP into Neology," they did not intend to perform within a reasonable time, and intended instead to induce Plaintiff to continue in his role and forego alternative opportunities while Defendants retained discretion to deny or withhold the promised subscription as they wished.

82.    Defendants intended that Plaintiff rely on these promises. Plaintiff reasonably relied by accepting the updated terms, continuing to perform through and after the OEP acquisition, remaining ready, willing, and able to subscribe on sponsor terms, and foregoing other employment and investment opportunities while Defendants controlled the timing and mechanics of the subscription.

83.    Despite Plaintiff's continued performance and repeated requests, Defendants never tendered a transactional opportunity for Plaintiff to subscribe to his pari-passu allocation on sponsor terms. On or about September 29, 2022, Defendants' counsel stated that "there was no separate pari-passu investment," confirming that the promised opportunity would not be provided.

84.    Plaintiff's reliance on Defendants' promises was a substantial factor in causing harm, including loss of the promised opportunity to invest alongside OEP on sponsor terms and the economic value that opportunity would have yielded, together with

- 18 -

consequential losses.

85.    In the further alternative, Defendants' September 29, 2022 statement that "there was no separate pari-passu investment" was false when made in light of the earlier writings and modeling identified above; that Defendants knew it was false or made it recklessly without regard to truth; that Plaintiff reasonably relied by continuing to pursue internal resolution rather than immediate litigation while Defendants maintained their position; and that this reliance was a substantial factor in causing additional harm, including delay-related losses.

## SIXTH CAUSE OF ACTION

### Promissory Estoppel (Pari-Passu Co-Investment Right)

(Against All Defendants)

86.    Plaintiff realleges all relevant prior paragraphs as though set out here.

87.    In the alternative, if no enforceable contract is found, Defendants made clear written promises that Plaintiff would have the opportunity to co-invest pari passu with OEP in Neology, and they included Plaintiff in internal allocation modeling, as alleged above.

88.    Defendants expected, and it was foreseeable, that Plaintiff would rely on those promises. Plaintiff did rely by continuing his employment, remaining ready to subscribe, and not pursuing alternative opportunities.

89.    Defendants did not provide the promised opportunity within a reasonable time. Plaintiff was thereby deprived of the ability to obtain the pari-passu interest and its economic value and was terminated when he began inquiring about his promised interests.

90.    Injustice can be avoided only by enforcing the promises.

## SEVENTH CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

(Against All Defendants)

91.    Plaintiff realleges all relevant prior paragraphs as though set out here.

92.    Plaintiff and Defendants entered into written contracts, including the 2014 Employment Agreement (providing severance and an annual bonus opportunity), the 2017

updated employment terms following OEP's acquisition (reaffirming severance and bonus and adding equity participation rights), and the written Management Equity Plan documents reflecting Plaintiff's vested equity and its valuation.

93.    Plaintiff did all, or substantially all, of the significant things these contracts required of him, or was excused from doing so. He served through his termination in or about September 2022, remained ready and willing to perform, and satisfied vesting and performance requirements tied to compensation and equity.

94.    All conditions required for Defendants' performance occurred or were excused, including the occurrence of the separation event triggering severance, the achievement of performance milestones supporting a pro-rata bonus, and the vesting of MEP equity that Defendants themselves valued in writing.

95.    Defendants unfairly interfered with Plaintiff's right to receive the benefits of the contracts by conditioning severance on execution of a broad release that was not required by the 2014 Employment Agreement or the 2017 updated terms, and by withholding the pro-rata bonus earned as of separation despite internal confirmation that Plaintiff was on track to meet his goals.

96.    Defendants further unfairly interfered with Plaintiff's contractual benefits by failing to tender, within a reasonable time, the promised pari-passu subscription opportunity on the sponsor's terms after committing to it in writing and modeling allocations, and later denying the existence of the separate pari-passu right after Plaintiff repeatedly requested the promised opportunity.

97.    Defendants also unfairly interfered with Plaintiff's contractual benefits under the MEP by paying only $185,000 against a written vested valuation of $524,807, by doing so via a "side" "floor" payment that was not an agreed modification of written plan obligations and the previously calculated and represented vested equity interest, and by characterizing that payment as W-2 income rather than as an equity payment in a manner that reduced the value to Plaintiff and increased his tax burden.

98.    Taken    together,    Defendants'    conduct—including    timing    Plaintiff's

termination shortly after he pressed his contract-based rights, requiring concessions not found in the parties' agreements, refusing to provide agreed mechanics for equity participation, and underpaying vested equity in the face of their own valuation—unfairly frustrated Plaintiff's rights to the benefits of his bargains.

99.    Plaintiff was harmed by Defendants' conduct, including the loss of severance benefits at separation, the loss of his earned pro-rata bonus, the shortfall on his vested MEP equity relative to Defendants' written valuation, additional tax-related consequences flowing from Defendants' characterization of payment, and other damages to be proven at trial.

100.    Defendants' unfair interference with Plaintiff's contractual rights was a substantial factor in causing this harm.

### EIGHTH CAUSE OF ACTION

**Retaliation for Asserting Rights (Lab. Code § 98.6) and Whistleblower Retaliation Lab. Code §§ 1102.5, 1102.6)**

(Against All Defendants)

101.    Plaintiff realleges all relevant prior paragraphs as though set out here.

102.    As alleged above, in early 2022 and continuing through his separation in or about September 2022, Plaintiff complained to Defendants' leadership and inquired about unpaid earned compensation due, and demanded that Defendants pay amounts due. These complaints and demands constituted the exercise of rights under the Labor Code and disclosures to persons with authority over Plaintiff regarding suspected violations of state wage laws.

103.    After Plaintiff engaged in the protected activity described above, Defendants took adverse employment actions against him, including terminating his employment during a purported restructuring, replacing him shortly thereafter, and withholding earned compensation. These actions followed close in time to Plaintiff's protected complaints and demands.

104.    Plaintiff is informed and believes, and thereon alleges, that his protected

activity was a contributing factor in Defendants' decision to take the adverse actions described above.

105.    Indeed, as part of his termination, Defendants required Plaintiff to sign a separation agreement in which Plaintiff would have given up the very rights he had inquired about pre-termination, including rights to the earned and vested equity.

106.    Plaintiff suffered harm, including lost wages and benefits, loss of career opportunities, and other compensatory damages, as a result of Defendants' retaliation. The retaliatory acts were a substantial factor in causing this harm.

107.    Defendants' conduct violated Labor Code section 98.6 because they retaliated against Plaintiff for exercising rights under the Labor Code and for complaining about nonpayment of wages due, and violated the whistleblower protection framework applicable to Labor Code section 1102.5 claims as governed by section 1102.6.

### NINTH CAUSE OF ACTION

### Declaratory Relief (CCP § 1060) — MEP Valuation/Rights and Pari-Passu Obligations

(Against All Defendants)

108.    Plaintiff realleges all relevant prior paragraphs as though set out here.

109.    An actual, present controversy exists between Plaintiff and Defendants concerning their respective rights and duties under written instruments and contracts, including the 2017 updated employment terms and writings regarding the pari-passu co-investment, the September 6, 2018 "Pari Passu calculations.xlsx" implementation materials, and the written Management Equity Plan documents and early-2022 written valuation of Plaintiff's vested equity at $524,807.

110.    With respect to the MEP, Plaintiff contends that his equity vested and that Defendants were and are obligated to pay the full vested value reflected in Defendants' written valuation, less any lawful, agreed offsets, and to do so in accordance with the plan's terms. Defendants contend, in substance, that payment of $185,000 satisfied or altered that obligation, and they dispute owing the balance and related interest or any correction to the

1    manner of payment.

2        111.    With respect to the pari-passu co-investment, Plaintiff contends that

3    Defendants promised in writing to provide him the opportunity to invest on the same terms

4    as OEP, identified a $1.5 million team pool, and modeled allocations, and that Defendants

5    were and are obligated to tender a subscription on sponsor terms within a reasonable time

6    or provide the economic equivalent. Defendants contend, in substance, that there was no

7    separate pari-passu investment right and dispute any obligation to tender such a subscription

8    or provide an equivalent remedy.

9        112.    These controversies are concrete and justiciable. Plaintiff has repeatedly

10   asserted his rights, including in March 2022, and Defendants have denied or limited those

11   rights, including on or about September 29, 2022, and by paying only $185,000 on the

12   vested MEP valuation and by never tendering a pari-passu subscription.

13       113.    A judicial declaration is necessary and appropriate at this time under Code of

14   Civil Procedure section 1060 to resolve these disputes and to guide the parties' future

15   conduct, including the calculation, timing, and characterization of payments, and whether

16   Defendants must now tender the pari-passu subscription or its economic equivalent.

17       114.    Plaintiff seeks a declaration that, under the MEP, he is entitled to the full

18   vested value of at least $524,807 as reflected in Defendants' early-2022 written valuation,

19   less any lawful, agreed offsets, together with prejudgment interest from the date the amount

20   became due and payable, and that Defendants' later $185,000 payment did not satisfy or

21   modify the written obligation absent Plaintiff's agreement.

22       115.    Plaintiff further seeks a declaration that Defendants are obligated to provide

23   Plaintiff the promised pari-passu co-investment opportunity on sponsor terms within a

24   reasonable time and that Defendants' failure to tender a subscription breached that

25   obligation; and that, if specific performance is impracticable, Defendants must provide the

26   economic equivalent of the position Plaintiff would have held had the subscription been

27   timely offered.

28       116.    Plaintiff also seeks any further necessary or proper declarations related to the

parties' rights and duties concerning the calculation, form, and timing of payments under the MEP and pari-passu writings, including the characterization of payments, the accrual of interest, and any ministerial steps required to effectuate the relief.

## TENTH CAUSE OF ACTION

### Conversion

(Against All Defendants)

117.    Plaintiff realleges all relevant prior paragraphs as though set out here.

118.    Plaintiff owned, and had an immediate right to possess and control, specific, identifiable property consisting of: (a) the vested Management Equity Plan ("MEP") amount Defendants valued in early 2022 at $524,807, less only lawful, agreed offsets; (b) his earned and determinable pro-rata bonus as of separation of approximately $112,192.00; (c) Plaintiff's promised severance pay under his employment agreement; and (d) Plaintiff's monies available through the use of his credit card after Plaintiff rescinded his authorization, which, though temporarily stopped, continued at least as of September 16, 2025.

119.    The sums described are ascertainable, segregable amounts capable of identification by reference to Defendants' written valuation (for the MEP), internal bonus calculations and communications (for the pro-rata bonus), and Plaintiff's promised severance pay under his employment agreement.

120.    After the MEP amount vested and was valued in writing at $524,807, Defendants intentionally exercised dominion over a specific portion of that sum by withholding and retaining the unpaid balance while unilaterally paying only $185,000, without a written modification agreed to by Plaintiff and without tendering the remaining, identifiable balance that belonged to Plaintiff.

121.    After Plaintiff earned the pro-rata bonus as of his separation, Defendants intentionally exercised dominion over that specific, identifiable bonus amount by withholding and retaining it at the time of termination and thereafter, while asserting conditions not found in the parties' agreement.

122.    After terminating Plaintiff in or about September 2022, Defendants did not

- 24 -

pay Plaintiff his promised severance.

123.    After terminating Plaintiff in or about September 2022, Defendants did not have any authorization to incur expenses on Plaintiff's credit card for the months thereafter, and even after allegedly stopping usage, continued use into September 2025.

124.    Plaintiff did not consent to Defendants' retention of the unpaid MEP balance or the earned pro-rata bonus, and he did not consent to Defendants' refusal to pay a severance.

125.    Plaintiff demanded that Defendants deliver the specific, identifiable sums described above, including the unpaid portion of the $524,807 vested MEP value, the approximately $112,192.00 earned pro-rata bonus, and severance. Defendants failed and refused to do so.

126.    Defendants' acts substantially interfered with Plaintiff's possessory rights in the specific property identified above by wrongfully exercising dominion and control over that property and applying it to Defendants' own use.

127.    As a direct and proximate result, Plaintiff suffered harm, including at least: the unpaid, identifiable balance of the vested MEP amount (i.e., the difference between $524,807 and $185,000); the unpaid, identifiable pro-rata bonus of approximately $112,192.00; and severance of at least $128,750.00. Defendants' conversion was a substantial factor in causing this harm.

128.    The facts surrounding Defendants' conduct are aggravated: Defendants withheld specific, identified compensation despite their own written valuation; asserted conditions not found in the parties' agreement; denied Plaintiff the timely return of his identifiable sums after demand; and moreover continued to use Plaintiff's personal credit card for months after terminating him and after being told to stop, and continued to use the credit card at least until September 2025.

/ / /

/ / /

/ / /

# ELEVENTH CAUSE OF ACTION

## Civil Theft (Penal Code § 496, subds. (a), (c))

(Against All Defendants)

129.    Plaintiff realleges all relevant prior paragraphs as though set out here.

130.    Penal Code section 496, subdivision (a) makes it unlawful to buy, receive, conceal, sell, or withhold property that has been obtained in any manner constituting theft or extortion, knowing the property to be so obtained. Subdivision (a) specifically states that a principal in the actual theft of the property may be found liable for violating the statute.

131.    Plaintiff owned specific, identifiable property in the form of: (a) his vested Management Equity Plan amount that Defendants valued in early 2022 at $524,807; (b) his earned and determinable pro-rata bonus as of separation of approximately $112,192.00; and (c) specific, identifiable sums that Defendants charged to Plaintiff's personal credit card after terminating his employment in or about September 2022, including the resulting interest, late fees, and penalties assessed on that account

132.    After termination, Defendants intentionally used Plaintiff's personal credit card, which they retained on file, to pay Defendants' expenses without Plaintiff's authorization and after Plaintiff asked them to stop. Through those charges, Defendants obtained money from Plaintiff by means constituting theft and thereafter withheld and retained the benefit of those specific funds for several months post-termination, and as recently as September 2025, had incurred additional charges on Plaintiff's credit card.

133.    Separately, after valuing Plaintiff's vested MEP at $524,807 and despite acknowledging his earned bonus about a month before separation, Defendants withheld the specific, identifiable balance of the vested MEP amount by unilaterally paying only $185,000 and retaining the remainder, and withheld the earned, identifiable pro-rata bonus, from Plaintiff at termination, and attempted to extract a release from Plaintiff through a separation agreement that did not acknowledge these amounts.

134.    The post-termination credit-card takings and the knowing retention of the identified sums for several months, without authorization despite notice to stop, and despite

Defendants' statement that they would stop using the credit card, were acts of theft or withholding of property obtained in a manner constituting theft within the meaning of Penal Code section 496, subdivision (a), including theft, theft by false pretenses or embezzlement, in that Defendants intentionally appropriated Plaintiff's money for their own use and withheld it from him for several months, and lied to him that they had stopped when they indeed continued to spitefully make Mr. Mullis carry the weight of their expenses until at least September 2025 when Mr. Mullis discovered their continuing unlawful use.

135.    Defendants knew that the identified sums were stolen or had been obtained by theft when they received, used, or withheld them. Among other facts, Defendants had: (a) actual written knowledge of the vested MEP valuation at $524,807 and yet retained the unpaid, identifiable balance; (b) actual notice that Plaintiff's pro-rata bonus was earned and determinable as of separation, yet they retained those identifiable funds; and (c) actual notice, including Plaintiff's explicit requests, that post-termination use of his credit card was unauthorized, yet they continued to incur charges and failed to promptly reverse or reimburse the resulting amounts.

136.    Plaintiff demanded return and reimbursement of the identified sums. While, after several months, Defendants repaid the principal stolen through the use of the credit card for several months post termination and are thereby liable for theft over such period, Defendants utterly failed and refused to return other identified sums and continue to withhold those specific amounts.

137.    Defendants' violations of Penal Code section 496 were a substantial factor in causing Plaintiff harm, including at least: (a) the unpaid, identifiable balance of the vested MEP amount (the difference between $524,807 and $185,000); (b) the unpaid, identifiable pro-rata bonus of approximately $112,192.00; and (c) the specific, identifiable sums paid or incurred on Plaintiff's personal credit card post-termination for Defendants' charges, interest, late fees, and penalties, for at least the several months Defendants did not pay.

138.    Pursuant to Penal Code section 496, subdivision (c), Plaintiff seeks treble damages measured by the identified sums wrongfully obtained and/or withheld, reasonable

attorneys' fees, costs of suit, prejudgment interest, and such other and further relief as the Court deems just and proper.

## TWELFTH CAUSE OF ACTION

**Unfair Competition (Bus. & Prof. Code § 17200 et seq. — "Unlawful," "Unfair," and "Fraudulent" Prongs)**

(Against All Defendants)

139.    Plaintiff realleges all relevant prior paragraphs as though set out here.

140.    Defendants engaged in business acts and practices as alleged above, including failing to pay earned wages at separation, conditioning payment obligations on execution of an overbroad release not required by contract, underpaying vested equity notwithstanding a written valuation, mischaracterizing equity payment as W-2 income, denying the existence of a promised pari-passu opportunity, and using Plaintiff's personal credit card post-termination without authorization.

141.    These acts and practices are "unlawful" within the meaning of Business and Professions Code section 17200 because they violate statutory and common-law provisions, including but not limited to Labor Code sections 200–204 (failure to pay earned wages when due), 203 (waiting-time penalties), and 98.6/1102.5 (retaliation for asserting his rights), and the common law of conversion relating to the unauthorized use of Plaintiff's personal credit account and funds.

142.    Independently, these acts and practices are "unfair" within the meaning of section 17200 in that they offend established public policies embodied in California's wage-payment statutes and in the requirement of fair dealing in employment compensation; the harms to Plaintiff and other employees are substantial, are not outweighed by countervailing benefits, and were not reasonably avoidable by Plaintiff where Defendants controlled the timing, mechanics, and release-based conditions of payment and continued to use Plaintiff's card after termination despite his objections.

143.    Independently, these acts and practices are "fraudulent" within the meaning of section 17200 because they were likely to deceive reasonable employees and consumers,

including Plaintiff, by representing or implying that severance and earned bonus could lawfully be conditioned on a release, that $185,000 satisfied Plaintiff's vested MEP value despite Defendants' earlier written valuation of $524,807, that there was "no separate pari-passu investment," and by depositing a unilateral "side" payment while withholding the balance. Plaintiff relied on Defendants' representations and omissions by continuing to perform, by pursuing internal resolution rather than immediate legal recourse, and by bearing charges Defendants placed on his personal card while awaiting due payment.

144.    As a result of Defendants' unlawful, unfair, and fraudulent business acts and practices, Plaintiff suffered injury in fact and lost money or property, including but not limited to unpaid earned wages (the pro-rata bonus), the unpaid portion of vested equity value, interest and penalties incurred on his personal credit card due to unauthorized post-termination charges, and other ascertainable monetary losses.

## THIRTEENTH CAUSE OF ACTION

### Common Counts (Money Had and Received; Money Paid/Assumpsit)

(Against All Defendants)

145.    Plaintiff realleges all relevant prior paragraphs as though set out here.

146.    This cause of action is pled in the alternative to Plaintiff's contract claims. It seeks recovery in equity for money that, in good conscience, belongs to Plaintiff but is held or retained by Defendants, and for money Plaintiff paid for Defendants' benefit at their special instance and request.

147.    Within the last four years, Defendants became indebted to Plaintiff for money had and received by Defendants for the use and benefit of Plaintiff, consisting of at least the compensation and equity value as well as the severance that should have been paid to Plaintiff but was withheld and retained by Defendants.

148.    As to the Management Equity Plan, in early 2022 Defendants provided a written valuation of Plaintiff's vested equity of $524,807. Defendants paid only $185,000 and retained the unpaid balance, which in equity and good conscience belongs to Plaintiff. The unpaid balance equals at least the difference between $524,807 and $185,000, plus

interest from the date the amount became due.

149. As to the earned bonus, by the time of separation Plaintiff had accrued a determinable pro-rata bonus of approximately $112,192.00. Defendants retained this money that in equity and good conscience belongs to Plaintiff.

150. As to the severance, Plaintiff was terminated purportedly without cause. Under the Employment Agreement, six months of severance became due, which Plaintiff estimates at approximately $128,750.00.

151. Despite demand, Defendants have not paid Plaintiff the sums identified above, and an account is due and owing in amounts to be proven at trial, including at least the unpaid vested equity balance, the unpaid bonus, and the unpaid severance, as well as amounts used on the credit card that are not fully ascertained but will be at trial.

152. Plaintiff has been harmed by Defendants' nonpayment. The sums described are liquidated or readily ascertainable, and Plaintiff is entitled to prejudgment interest pursuant to Civil Code section 3287 from the dates the amounts became due.

153. Defendants are jointly and severally indebted to Plaintiff for money had and received for his use and benefit and for money paid, laid out, and expended at their special instance and request.

## **PRAYER FOR RELIEF**

1. For general and special damages for breach of written contracts, including, without limitation, the unpaid six months of severance due at separation (approximately $128,750), the earned and determinable pro-rata bonus (approximately $112,192.00) due at separation, and the unpaid balance of Plaintiff's vested MEP value (the difference between $524,807 and $185,000), in exact amounts to be proven at trial.

2. For specific performance of the pari-passu co-investment right, requiring Defendants to tender to Plaintiff a subscription on sponsor terms within a reasonable time; or, in the alternative, for a monetary award equal to the economic equivalent of the position Plaintiff would have held had the subscription been timely offered and accepted.

3.     For declaratory relief under Code of Civil Procedure section 1060 adjudging the parties' respective rights and obligations regarding: (a) Plaintiff's vested MEP rights and the amount due (including interest and proper characterization of payment); and (b) Defendants' obligations to provide the pari-passu co-investment opportunity (or its economic equivalent).

4.     For restitution and equitable relief under the Unfair Competition Law, including: (a) restitution of all money wrongfully retained or obtained from Plaintiff, including unpaid earned bonus, the unpaid vested MEP balance, and specific, identifiable sums charged to Plaintiff's personal credit card;(b) injunctive relief enjoining continuation or resumption of the unlawful, unfair, or fraudulent practices alleged; and (c) constructive trust and accounting over monies or property acquired through such practices.

5.     For conversion remedies, including the return of all specific, identifiable sums converted (unpaid vested MEP balance, earned bonus amounts, and severance amounts, and unauthorized credit card expenditures), according to proof.

6.     For statutory wage remedies, including: (a) all unpaid earned wages (including the earned pro-rata bonus and the vested equity value treated as wages as of separation), under Labor Code sections 200–204; (b) waiting-time penalties under Labor Code section 203; and (c) civil penalties under Labor Code section 98.6 (including up to $10,000 per violation), together front pay in lieu of reinstatement and backpay, as appropriate.

7.     For whistleblower retaliation remedies under Labor Code section 1102.5 as governed by section 1102.6, including front pay, backpay, and all other make-whole relief authorized by statute.

8.     For prejudgment interest on liquidated or ascertainable sums (including but not limited to the earned bonus, vested MEP balance, and severance due) pursuant to Civil Code section 3287, and prejudgment interest on tort damages as permitted by Civil Code section 3288; and for postjudgment interest at the legal rate.

/ / /

9.      For an equitable tax adjustment/gross-up or surcharge sufficient to neutralize the additional tax burden caused by Defendants' improper characterization and timing of payments, in an amount to be proven at trial.

10.     For three times the amount of actual damages sustained by Plaintiff, pursuant to Penal Code section 496(c).

11.     For punitive damages under Civil Code section 3294 on Plaintiff's tort claims (including fraud and conversion) as well as the pertinent allegations regarding Defendants' conduct, in an amount sufficient to punish and deter Defendants' oppression, fraud, or malice, according to proof.

12.     For attorneys' fees and costs as permitted by statute, contract, or other law, including without limitation Labor Code section 218.5 (wage claims), Labor Code section 1102.5, subdivision (j) (whistleblower retaliation), Code of Civil Procedure section 1021.5 (where applicable), Penal Code section 496(c), and any applicable fee-shifting provisions at law, equity, or in the parties' agreements.

13.     For costs of suit incurred herein.

14.     For such other and further legal and equitable relief as the Court deems just and proper.

Dated: September 25, 2025

By: _____
Joseph Mullis
*Pro Se*.

COMPLAINT