# EXHIBIT D

EXECUTION VERSION

## OEP NEOLOGY CAYMAN, L.P.

### INCENTIVE PARTNERSHIP INTEREST GRANT AGREEMENT

**THIS INCENTIVE PARTNERSHIP INTEREST GRANT AGREEMENT** (this "Agreement") is made on March 1, 2022 (the "Grant Date") by and among OEP Neology Cayman, L.P., an exempted limited partnership formed and registered in the Cayman Islands (the "Partnership"), OEP VI General Partner, L.P., an exempted limited partnership formed and registered under the laws of the Cayman Islands, general partner of the Partnership (the "General Partner") acting by its general partner, OEP VI GP, Ltd. and Joe Mullis ("Executive"). Capitalized terms used but not otherwise defined herein shall have the meaning assigned to such terms in the "LP Agreement" (as defined in Section 21 hereof). Where the context requires references to the Partnership in this Agreement shall be references to the General Partner acting in its capacity as general partner of the Partnership.

**NOW THEREFORE,** in consideration of the mutual covenants and promises hereinafter set forth and for other good and valuable consideration, the parties hereto hereby mutually covenant and agree as follows:

1.  Issuance of Units.

    (a) Issuance.  Upon execution of this Agreement, the Partnership will issue to Executive, and Executive will accept from the Partnership, 189 Incentive Partnership Interests in connection with such Executive's employment and/or services, without any monetary consideration paid, or any other contributed capital made or deemed made, by or on behalf of Executive in respect thereof, subject to the provisions of the LP Agreement and this Agreement.  The Incentive Partnership Interests granted hereunder (and any equity or other capital interests issued with respect to such Incentive Partnership Interests, including by way of any split, combination, distribution or other recapitalization of such Incentive Partnership Interests) are referred to herein as the "Executive Units."  The Floor Amount of the Executive Units as of the date hereof is $35,000,000 and may be adjusted from time to time as provided in the LP Agreement and Section 1(h) hereof.  For the avoidance of doubt, the Executive Units shall be classified as a "profits interest" (as that term is used in Revenue Procedures 93-27 and 2001-43), and accordingly, the Executive Units shall not share in the value of the Partnership's assets as of the Grant Date, and shall only share in any subsequent appreciation in value of the Partnership's assets following the Grant Date in accordance with the LP Agreement.

    (b)    Partnership Reliance.  By execution hereof, Executive acknowledges that the Partnership is relying upon the accuracy and completeness of the representations and warranties contained herein in complying with the Partnership's obligations under applicable securities laws.

    (c)    Tax Election.  Executive shall make an effective election with the United States Internal Revenue Service under Section 83(b) of the Code in the form of Exhibit A attached hereto and shall deliver herewith the executed Section 83(b) election to the Partnership for filing with the United States Internal Revenue Service.

(d)     No Certificates.  The Executive Units shall be uncertificated unless otherwise determined by the General Partner.

(e)     Executive's Representations and Warranties.

(i)     Executive understands, acknowledges and agrees that (i) Executive has received a copy of the LP Agreement, (ii) has read and understands the terms and conditions of the LP Agreement and has consulted with legal counsel regarding the same to the extent Executive deemed necessary, (iii) the Executive Units are subject to all of the rights, obligations and restrictions contained in the LP Agreement and this Agreement, and (iv) the representations, warranties and undertakings in clause 5.5 of the LP Agreement are hereby incorporated into this Agreement by reference and shall have the same legal force and effect as if the same were fully set forth herein, and Executive hereby reaffirms all of such representations, warranties and undertakings of Executive thereunder.

(ii)     Executive represents and warrants that it is not and, to the best of its knowledge or belief, none of its beneficial owners, controllers or authorized persons ("Related Persons") (if any) is, a politically exposed person, or a family member or close associate of a politically exposed person, or is acting on behalf of a politically exposed person, or is a shell bank, as each of those terms is defined in the Anti-Money Laundering Regulations (2018 Revision) of the Cayman Islands.

(iii)     Executive is not and, to the best of the Executive's knowledge or belief, none of its Related Persons (if any) is (i) named on any list of sanctioned entities or individuals maintained by the US Treasury Department's Office of Foreign Assets Control ("OFAC") or pursuant to European Union ("EU") and/or United Kingdom ("UK") Regulations (as the latter are extended to the Cayman Islands by Statutory Instrument), (ii) operationally based or domiciled in a country or territory in relation to which sanctions imposed by the United Nations, OFAC, the EU and/or the UK apply, or (iii) otherwise subject to sanctions imposed by the United Nations, OFAC, the EU or the UK (including as the latter are extended to the Cayman Islands by Statutory Instrument) (collectively, a "Sanctions Subject").

(iv)     Executive acknowledges and agrees that (i) should the Executive or a Related Person be, or become at any time during its investment in the Partnership, a Sanctions Subject, the General Partner may immediately and without notice to the Executive cease any further dealings with the Executive and/or the Executive's interest in the Partnership until the Executive ceases to be a Sanctions Subject or a license is obtained under applicable law to continue such dealings (a "Sanctioned Persons Event"), and (ii) the Partnership and the General Partner shall have no liability whatsoever for any liabilities, costs, expenses, damages and/or losses (including but not limited to any direct, indirect or consequential losses, loss of profit, loss of revenue, loss of reputation and all interest, penalties and legal costs and all other professional costs and expenses) incurred by the Executive as a result of a Sanctioned Persons Event.

(f)     Additional Acknowledgements.  As an inducement to the Partnership to issue the Executive Units to Executive and as a condition thereto, Executive hereby acknowledges and agrees that:

(i)     neither the issuance of the Executive Units to Executive nor any provision contained in this Agreement or the LP Agreement shall entitle Executive to remain in the employ of the Partnership or any of its subsidiaries or affect the right of the Partnership or any of its subsidiaries to terminate Executive's employment at any time; and

(ii)     except as expressly set forth in the LP Agreement or as required by applicable law, the General Partner shall have no duty or obligation to disclose to Executive, and Executive shall have no right to be advised of, any material information regarding the Partnership or any of its subsidiaries at any time prior to, upon or in connection with the repurchase of Executive Units upon the termination of Executive's employment with the Partnership and/or any of its subsidiaries or as otherwise provided hereunder.

(g)     <u>Compensatory Arrangements</u>.    The General Partner and Executive hereby acknowledge and agree that this Agreement has been executed and delivered, and the Executive Units have been issued hereunder, in connection with and as a part of the compensation and incentive arrangements between the Partnership and the applicable subsidiaries, on the one hand, and Executive, on the other hand.  Each of the Executive Units granted hereunder is intended to qualify for an exemption from the registration requirements under the Securities Act, and under similar exemptions under applicable state securities laws.  In the event that any provision of this Agreement would cause the Executive Units granted hereunder not to qualify for an applicable exemption from registration under the Securities Act, Executive and the General Partner agree that this Agreement shall be deemed automatically amended to the extent necessary to cause the Executive Units to qualify for such an exemption.

(h)     <u>Adjustments</u>.    If there shall occur any change with respect to the outstanding Partnership Interests by reason of any recapitalization, reclassification, stock split, reverse stock split or any merger, reorganization, consolidation, combination, spin-off or other similar corporate change affecting the Partnership Interests, the General Partner shall, in a reasonable manner but only to the extent that it deems appropriate and equitable in its discretion, cause an adjustment to be made in the number of Executive Units granted hereunder, the Floor Amount and any other terms hereunder that are affected by the event to prevent dilution or enlargement of Executive's rights hereunder.

2.     <u>Vesting of Executive Units</u>.

(a)     <u>Vesting</u>.    The Executive Units shall become vested in equal annual installments on each of the first five (5) anniversaries of July 1, 2017, <u>provided</u> that Executive is then employed by or performing services for the Partnership or its subsidiaries.  There will be no proportionate or partial vesting prior to such vesting date and all vesting will occur only on such vesting date, subject to Executive's continued employment or other service with the Partnership or its subsidiaries through such vesting date.

(b)     <u>Sale of the Partnership; Discretion to Accelerate Vesting</u>.    Upon the consummation of a Sale of the Partnership, all of the unvested Executive Units shall immediately vest if Executive is then employed by or providing services to the Partnership or its subsidiaries. In addition, the General Partner may, in its sole discretion, vest any and/or all of the unvested

Executive Units hereunder at such time or such other time or times and on such other conditions as the General Partner determines.

(c)    Forfeitures.    All vesting of Executive Units shall cease immediately upon termination of Executive's service with the Partnership and its subsidiaries for any reason, and all unvested Executive Units shall be automatically forfeited and cancelled for no value upon any such termination without any consideration being paid therefor and otherwise without any further action of the Partnership whatsoever. Notwithstanding any of the otherwise applicable vesting conditions of this Section 2, the Executive Units shall always be subject to the repurchase and forfeiture conditions of Section 5(a) hereof in the event of a termination for Cause.

3.    Restrictions Generally.    The Executive Units are subject to the provisions of the LP Agreement, which agreement provides, among other things, restrictions on transfer, and certain drag-along, tag-along, registration rights and holdback provisions with respect to the Executive Units.

4.    Adherence to the LP Agreement and Power of Attorney.

(a)    Executive hereby agrees that this Agreement has been executed and delivered, and the Executive Units have been issued hereunder, in connection with and as a part of the compensation and incentive arrangements between the Partnership and Executive and, except as otherwise specified herein, pursuant to the terms and conditions of the LP Agreement. The power of attorney provisions and undertakings in the LP Agreement, including, without limitation, clauses 16.2(c), 16.3(c) and 31 of the LP Agreement are hereby incorporated into this Agreement by reference and shall have the same legal force and effect as if the same were fully set forth herein, and Executive hereby reaffirms all of Executive's obligations and the power of attorney granted by Executive thereunder. Executive hereby agrees with the General Partner and as separate agreements with each partner of the Partnership for whom the General Partner is executing this Agreement as agent and attorney-in-fact that Executive will henceforth comply with and observe and have the benefit and be subject to the burden of all of the agreements and covenants and obligations of the Limited Partners contained in the LP Agreement as if Executive had been an original party thereto and as if the same were herein set out in full, and the General Partner and each of the Limited Partners hereby severally agree likewise with Executive and the General Partner hereby admits the Executive as a Limited Partner on the Grant Date.

(b)    The Partnership and Executive each acknowledges and agrees that Executive shall be entitled to the applicable benefits, and shall be subject to the applicable obligations, under the LP Agreement.  In the event that Executive fails to timely comply with any of Executive's obligations under the LP Agreement as determined by the General Partner in its good-faith discretion, Executive may be required to immediately forfeit any or all of the Executive Units outstanding at the time of such non-compliance without any consideration being paid therefor.

5.    Repurchase Rights.

(a)    If Executive ceases to be employed by the Partnership or any of its subsidiaries for any reason, then the General Partner shall have the right (but not the obligation) to repurchase all or any portion of the vested Executive Units at a price equal to the "Fair Market Value" (as

defined in the LP Agreement) of the Executive Units to be repurchased as of the date specified in the "Repurchase Notice" (as defined below) as determined in this Section 5; provided, however, that if a repurchase occurs following a termination of Executive's employment or services with the Partnership or its subsidiaries by the Partnership or its subsidiaries for Cause, then the General Partner shall have the right (but not the obligation) to repurchase all or any portion of the vested Executive Units at a price equal to the lesser of the original purchase price of such Executive Units and the Fair Market Value of the Executive Units to be repurchased as of the date specified in the Repurchase Notice as determined in this Section 5; provided, further, that if the original purchase price of such vested Executive Units was zero, then such vested Executive Units shall be immediately forfeited and cancelled as of the date of such termination for Cause without any consideration being paid therefor and otherwise without any further action of the General Partner whatsoever.

(b)    The General Partner shall have the right (but not the obligation) to elect to purchase all or any portion of any vested Executive Units by delivering written notice to Executive (the "Repurchase Notice"), within two hundred ten (210) calendar days (or such longer period as may be necessary to avoid changing the accounting treatment for the acquisition of the Executive Units being repurchased from an equity-based accounting treatment to a liability-based accounting treatment (as contemplated by FASB ASC Topic 718)) following the date of Executive's termination of service (such date, the "Termination Date"), which Repurchase Notice shall set forth the type and number of Executive Units to be acquired, the date on which the aggregate consideration to be paid therefor is to be determined and the time and place for the closing of the repurchase contemplated by this Section 5 (the "Repurchase Closing"). For purposes of this Section 5, the applicable repurchase price shall be determined as of the date specified in the Repurchase Notice and shall be (i) on or after the date of the Repurchase Notice (which, for the sake of clarity, may not be delivered until after the Termination Date), and (ii) no later than the later of (A) the first date on which the repurchase price can be set without changing the accounting treatment for the acquisition of the Executive Units being repurchased from an equity-based accounting treatment to a liability-based accounting treatment (as contemplated by FASB ASC Topic 718), and (B) two hundred ten (210) calendar days after Executive's Termination Date. For the sake of clarity, the General Partner may elect to repurchase vested Executive Units in one or more separate transactions, it being understood that the General Partner may not repurchase any Executive Units after the last date provided for herein.

(c)    The Repurchase Closing shall take place on the date designated by the General Partner in the Repurchase Notice, which date shall not be more than thirty (30) calendar days nor less than five (5) calendar days after the date specified in such notice for the determination of the repurchase price. The General Partner may pay for the Executive Units to be purchased by it (i) in cash payable by delivery of a cashier's or bank check or a wire transfer of immediately available funds (provided that the General Partner may deliver a check on behalf of the Partnership for any amount that is less than $1,000,000), (ii) by the cancellation of any indebtedness owed by Executive to the Partnership or any of its subsidiaries, (iii) by the issuance of a promissory note, or (iv) in a combination of (i), (ii) and (iii) above, as determined in the sole discretion of the General Partner, in the amount of the aggregate repurchase price of the Executive Units being repurchased by the General Partner. Without limiting the General Partner's rights under this Section 5, the General Partner shall use its commercially reasonable

efforts to pay for the Executive Units to be purchased by it in cash. Notwithstanding any other provision to the contrary contained herein, the General Partner may assign its rights under this <u>Section 5</u> to any of the Partnership's subsidiaries.  In addition, the General Partner shall have the right to require Executive to exchange all of the Executive Units held by Executive for equity securities of any of the General Partner's direct or indirect parent entities or subsidiaries having an aggregate value equal to the repurchase price of such Executive Units (which repurchase price shall be determined in accordance with the provisions of this <u>Section 5</u>), so long as such entity promptly consummates the repurchase transactions contemplated by this <u>Section 5</u> and pays the repurchase price to Executive in the form(s) contemplated by this <u>Section 5</u>.  The purchaser(s) of Executive Units hereunder shall be entitled to receive customary representations and warranties from Executive regarding such sale regarding the conveyance of title to the Executive Units; <u>provided</u> that the recourse of the purchaser(s) shall be limited to the aggregate consideration received by Executive with respect to the repurchased Executive Units.

(d)     All repurchases of Executive Units pursuant to this <u>Section 5</u> shall be subject to all applicable restrictions under law or contained in the financing agreements or other material contracts to which the General Partner, the Partnership or any of their respective subsidiaries are a party.  If any such restrictions prohibit the repurchase of Executive Units hereunder which the General Partner is otherwise entitled to make, then (i) the General Partner shall promptly give written notice to Executive of such restriction, (ii) the General Partner's and the Partnership's rights and obligations under this <u>Section 5</u> shall be preserved and the time periods governing such rights or obligations shall be tolled for the duration of such restriction, and (iii) the General Partner may make such repurchase as soon as (and to the extent that) it is permitted to do so by law and such financing agreements or other material contracts.

(e)     The repurchase rights granted in this <u>Section 5</u> shall terminate upon the consummation of an initial Public Offering.

6.     <u>Restrictive Covenants</u>.

(a)     <u>Confidentiality</u>.  The Confidentiality provisions and undertakings in clause 19 of the LP Agreement are hereby incorporated into this Agreement by reference and Executive hereby reaffirms all of Executive's obligations thereunder.   Additionally, the terms and conditions of this Agreement shall remain strictly confidential, and Executive hereby agrees not to disclose the terms and conditions hereof to any Person or entity, other than immediate family members, legal advisors or personal tax or financial advisors, or prospective future employers solely for the purpose of disclosing the limitations on Executive's conduct imposed by the provisions of this <u>Section 6</u> who, in each case, agree to keep such information confidential.

(b)     <u>Non-Competition</u>.  Executive acknowledges that (i) Executive will perform services of a unique nature for the Partnership and its direct Affiliates that are irreplaceable, and that Executive's performance of such services to a competing business will result in irreparable harm to the Partnership, (ii) Executive will have access to Confidential Information (as defined in the LP Agreement) which, if disclosed, would unfairly and inappropriately assist in competition against the Partnership or any of its direct Affiliates, (iii) in the course of Executive's employment by a competitor, Executive would inevitably use or disclose such Confidential Information, (iv) the Partnership and its direct Affiliates have substantial

relationships with their customers and Executive will have access to these customers, and (v) Executive will generate goodwill for the Partnership and its direct Affiliates in the course of Executive's employment.  Accordingly, during Executive's employment with the Partnership and its subsidiaries and for a period of nine (9) months following the termination of Executive's employment and/or services with the Partnership or its subsidiaries for any reason, Executive agrees that Executive will not, directly or indirectly, own, manage, operate, control, be employed by (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) or render services to any Person, in whatever form, engaged in the "Business" (as defined below), in any locale of any country in which the Partnership and its subsidiaries conducts the Business.  For purposes hereof, the term "Business" shall mean the business of developing passive radio frequency identification (RFID) technology solutions for automatic vehicle identification, the tolling and automated license plate recognition (ALPR) business or any other material business in which the Partnership or any of its direct Affiliates is engaged as of the date on which Executive ceases to hold an equity interest in the Partnership or in which they have actively planned, on or prior to such date, to be engaged in on or after such date. Notwithstanding the foregoing, nothing herein shall prohibit Executive from being a passive owner of not more than one percent (1%) of the equity securities of a publicly traded corporation engaged in a business that is in competition with the Partnership or any of its subsidiaries, so long as Executive has no active participation in the business of such corporation.

(c)    Non-Solicitation; Non-Interference.  During Executive's employment with the Partnership or any of its subsidiaries and for a period of nine (9) months following the termination of Executive's employment and/or services with the Partnership or its subsidiaries for any reason, Executive agrees that Executive shall not, except in the furtherance of Executive's duties to the Partnership or any of its subsidiaries, directly or indirectly, individually or on behalf of any other Person, (i) solicit, aid or induce any customer of the Partnership or any of its direct Affiliates to purchase goods or services then sold by the Partnership or any of its direct Affiliates from another Person or assist or aid any other Person in identifying or soliciting any such customer, (ii) solicit, aid or induce any employee, representative or agent of the Partnership or any of its direct affiliates to leave such employment or retention or to accept employment with or render services to or with any other Person unaffiliated with the Partnership (provided that the foregoing shall not prohibit any general solicitations through an advertisement not specifically targeted at the Partnership, its direct Affiliates or any of their respective employees, representatives or agents), or hire or retain any such employee, representative or agent, or take any action to materially assist or aid any other Person in identifying, hiring or soliciting any such employee, representative or agent, or (iii) interfere, or aid or induce any other Person in interfering, with the relationship between the Partnership or any of its direct affiliates and any of their respective vendors, joint venturers or licensors.  An employee, representative or agent shall be deemed covered by this Section 6(c) while so employed or retained and for a period of six (6) months thereafter.

(d)    Inventions.

(i)    Executive acknowledges and agrees that all ideas, methods, inventions, discoveries, improvements, work products, developments, software, know-how, processes, techniques, methods, works of authorship and other work product, whether patentable or unpatentable, (A) that are reduced to practice, created, invented, designed, developed,

contributed to, or improved with the use of any Partnership resources and/or within the scope of Executive's work with the Partnership or any of its subsidiaries or that relate to the business, operations or actual or demonstrably anticipated research or development of the Partnership or any of its subsidiaries, and that are made or conceived by Executive, solely or jointly with others, during the period of Executive's employment with the Partnership or any of its subsidiaries, or (B) suggested by any work that Executive performs in connection with the Partnership or any of its subsidiaries, either while performing Executive's duties with the Partnership or any of its subsidiaries or on Executive's own time, but only insofar as related to Executive's work as an employee or other service provider to the Partnership or any of its subsidiaries, shall belong exclusively to the Partnership and the applicable subsidiaries (or their designees), whether or not patent or other applications for intellectual property protection are filed thereon (the "Inventions"). Executive will keep full and complete written records (the "Records"), in the manner prescribed by the Partnership and the applicable subsidiaries, of all Inventions, and will promptly disclose all Inventions completely and in writing to the Partnership and the applicable subsidiaries. The Records shall be the sole and exclusive property of the Partnership and the applicable subsidiaries, and Executive will surrender them upon the termination of Executive's employment with the Partnership and the applicable subsidiaries, or upon request. Executive will assign to the Partnership and the applicable subsidiaries the Inventions and all patents or other intellectual property rights that may issue thereon in any and all countries, whether during or subsequent to the period of Executive's employment with the Partnership and the applicable subsidiaries, together with the right to file, in Executive's name or in the name of the Partnership and the applicable subsidiaries (or their designees), applications for patents and equivalent rights (the "Applications"). Executive will, at any time during and subsequent to the period of Executive's employment with the Partnership and the applicable subsidiaries, make such applications, sign such papers, take all rightful oaths, and perform all other acts as may be reasonably requested from time to time by the Partnership and the applicable subsidiaries to perfect, record, enforce, protect, patent or register the Partnership's and the applicable subsidiaries' rights in the Inventions, all without additional compensation to Executive from the Partnership, but entirely at the Partnership's expense. Executive will also execute assignments to the Partnership and the applicable subsidiaries (or their designees) of the Applications, and give the Partnership and the applicable subsidiaries and their attorneys all reasonable assistance (including the giving of testimony) to obtain the Inventions for the Partnership's and the applicable subsidiaries' benefit, all without additional compensation to the Executive, but entirely at the Partnership's and the applicable subsidiaries' expense.

(ii)    In addition, the Inventions will be deemed Work for Hire, as such term is defined under the copyright laws of the United States, on behalf of the Partnership and the applicable subsidiaries and Executive agrees that the Partnership and the applicable subsidiaries will be the sole owner of the Inventions, and all underlying rights therein, in all media now known or hereinafter devised, throughout the universe and in perpetuity without any further obligations to Executive. If the Inventions, or any portion thereof, are deemed not to be Work for Hire, or the rights in such Inventions do not otherwise automatically vest in the Partnership and the applicable subsidiaries, Executive hereby irrevocably conveys, transfers and assigns to the Partnership and the applicable subsidiaries, all rights, in all media now known or hereinafter devised, throughout the universe and in perpetuity, in and to the Inventions, including, without limitation, all of Executive's right, title and interest in the copyrights (and all renewals, revivals and extensions thereof) to the Inventions, including, without limitation, all rights of any kind or

any nature now or hereafter recognized, including, without limitation, the unrestricted right to make modifications, adaptations and revisions to the Inventions, to exploit and allow others to exploit the Inventions and all rights to sue at law or in equity for any infringement, or other unauthorized use or conduct in derogation of the Inventions, known or unknown, prior to the date hereof, including, without limitation, the right to receive all proceeds and damages therefrom. In addition, Executive hereby waives any so-called "moral rights" with respect to the Inventions. To the extent that Executive has any rights in the Inventions that cannot be assigned in the manner described herein, Executive agrees to unconditionally waive the enforcement of such rights. Executive hereby waives any and all currently existing and future monetary rights in and to the Inventions and all patents and other registrations for intellectual property that may issue thereon, including, without limitation, any rights that would otherwise accrue to Executive's benefit by virtue of Executive being an employee of or other service provider to the Partnership and the applicable subsidiaries.

(e)  <u>Non-Disparagement</u>.  Executive agrees not to make negative comments or otherwise disparage the General Partner, the Partnership or any of its subsidiaries, or any of their respective officers, directors, employees, shareholders, members, agents or products other than in the good faith performance of Executive's duties to the Partnership and its subsidiaries while Executive is employed by the Partnership and its subsidiaries. The foregoing shall not be violated by truthful statements by either party in response to legal process, required governmental testimony or filings, or administrative or arbitral proceedings (including, without limitation, depositions in connection with such proceedings).

(f)  <u>Reasonableness of Covenants</u>.  In signing this Agreement, Executive gives the Partnership assurance that Executive has carefully read and considered all of the terms and conditions of this Agreement and the LP Agreement, including the restraints imposed under this <u>Section 6</u>. Executive agrees that these restraints are necessary and proportionate for the reasonable and proper protection of the Partnership and its subsidiaries and their Confidential Information and that each and every one of the restraints is reasonable in respect of subject matter, length of time and geographic area, and that these restraints, individually or in the aggregate, will not prevent Executive from obtaining other suitable employment during the period in which Executive is bound by the restraints. Executive acknowledges that each of these covenants has a unique, very substantial and immeasurable value to the Partnership and its subsidiaries and that Executive has sufficient assets and skills to provide a livelihood while such covenants remain in force. Executive further covenants that Executive will not challenge the reasonableness or enforceability of any of the covenants set forth in this <u>Section 6</u>, and that Executive will reimburse the Partnership and its subsidiaries for all costs (including reasonable attorneys' fees) incurred in connection with any action to enforce any of the provisions of this <u>Section 6</u> if either the Partnership and/or its subsidiaries prevails on any material issue involved in such dispute or if Executive challenges the reasonableness or enforceability of any of the provisions of this <u>Section 6</u>. It is also agreed that each of the Partnership's subsidiaries will have the right to enforce all of Executive's obligations to that subsidiaries under this Agreement, including without limitation pursuant to this <u>Section 6</u>.

(g)  <u>Reformation</u>.  If it is determined by a court of competent jurisdiction in any state that any restriction in this <u>Section 6</u> is excessive in duration or scope or is unreasonable or unenforceable under applicable law, it is the intention of the parties that such restriction may be

9

modified or amended by the court to render it enforceable to the maximum extent permitted by the laws of that state.

(h)    Tolling.  In the event of any violation of the provisions of this Section 6, Executive acknowledges and agrees that the post-termination restrictions contained in this Section 6 shall be extended by a period of time equal to the period of such violation, it being the intention of the parties hereto that the running of the applicable post-termination restriction period shall be tolled during any period of such violation.

(i)    Survival.  The obligations contained in this Section 6 hereof shall survive the termination of Executive's employment with the Partnership or any of its subsidiaries and the date on which Executive no longer holds, directly or indirectly, any equity in the Partnership, and shall be fully enforceable thereafter in accordance with the terms hereof.

(j)    Remedies.  Executive acknowledges and agrees that the Partnership's remedies at law for a breach or threatened breach of any of the provisions of this Section 6 would be inadequate and, in recognition of this fact, Executive agrees that, in the event of such a breach or threatened breach, in addition to any remedies at law, the General Partner, on behalf of the Partnership, without posting any bond or other security, shall be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available, without the necessity of showing actual monetary damages.  In the event of any material violation by Executive of this Section 6, any Executive Units outstanding at the time of such violation shall be immediately forfeited and cancelled as of the date of such violation without any consideration being paid therefor and otherwise without any further action of the Partnership whatsoever; provided that if such violation occurs after the Partnership has paid the repurchase price for the Executive Units under Section 5 hereof, then the Partnership shall be entitled to recover from Executive any amounts previously paid in excess of the amount required to be paid in accordance with the terms of this Agreement as if Executive had incurred a termination for Cause.  In the event that the Partnership repurchase rights under Section 5 hereof are no longer applicable at the time when Executive violates any of the provisions of this Section 6, as a result of the prior completion of an initial Public Offering, (i) all Executive Units (or the securities into which they were converted in connection with the initial Public Offering) that are then outstanding and held by Executive will be immediately forfeited to the Partnership in exchange for a refund of a cash amount equal to the lesser of (x) the original purchase price paid therefor, and (y) the Fair Market Value thereof as of the date of such forfeiture (or, if the original purchase price of the Executive Units was zero, then such Executive Units shall be immediately forfeited and cancelled without any consideration being paid therefor and otherwise without any further action of the Partnership whatsoever), and (ii) the Partnership shall be entitled to recover from Executive, and Executive shall pay over to the Partnership, an amount equal to any gain realized in respect of the Executive Units (or the securities into which they were converted in connection with the initial Public Offering) during the twelve (12)-month period prior to such violation.

7. Power of Attorney. The Executive hereby irrevocably constitutes and appoints the General Partner as its true and lawful agent and attorney-in-fact with full power to make, execute, deliver, sign, swear to, acknowledge and file all certificates and other instruments (including, without limitation, the LP Agreement and any other deeds and any amendments thereto) necessary to (i)

carry out the provisions of the LP Agreement (ii) admit and accede the Executive as a Limited Partner to the Partnership and/or (iii) give full effect to the terms of this Agreement (including, without limitation, Section 5). The above power of attorney shall be irrevocable and deemed to be given to secure a proprietary interest of the donee of the power or performance of an obligation owed to the donee and shall survive and shall not be affected by the subsequent death, lack of capacity, insolvency, bankruptcy or dissolution (as applicable) of the Executive.

8.   <u>AEOI Self-Certification</u>. On or prior to the date of this Agreement, the Executive shall provide to the General Partner the duly completed AEOI self-certification (Individual) in the form that is available from the Cayman Islands Tax Information Authority at: http://www.tia.gov.ky/pdf/Individual_Self_-_Certification_Form.docx. The Executive represents and warrants to the General Partner that the completed AEOI self-certification is true, complete and accurate in all respects.

9.   <u>Entire Agreement; Amendments</u>.  This Agreement, together with the LP Agreement and any side letter with respect to the Executive (as contemplated by the LP Agreement), contain the entire agreement between the parties hereto with respect to the subject matter contained herein, and supersedes all prior agreements or prior understandings, whether written or oral, between the parties hereto relating to such subject matter.  No modification, amendment or waiver of any provision of this Agreement shall be effective against the General Partner, the Partnership or Executive unless such modification, amendment or waiver is approved in writing by the General Partner and Executive; <u>provided</u> that the General Partner may modify, amend or waive any provision of this Agreement without the consent of Executive unless such amendment, modification or waiver would adversely affect the rights of Executive hereunder.

10.   <u>Notices</u>.  Any notice which may be required or permitted under this Agreement shall be in writing, and shall be delivered in person or via facsimile transmission, overnight courier service or certified mail, return receipt requested, postage prepaid, properly addressed as follows:

(a)   If such notice is to the General Partner, to:

Address:   One Equity Partners
510 Madison Avenue, 19th Floor
New York, NY 10022
Attention: Andrew Dunn and Charles Cole

Fax:   (212) 277-1556

Email:   andrew.dunn@oneequity.com, charles.cole@oneequity.com

or at such other address as the General Partner, by notice to Executive, shall designate in writing from time to time.

(b)   If such notice is to Executive, at Executive's address as shown on the Partnership's records, or such other address as Executive, by notice to the Partnership, shall designate in writing from time to time.

(c) Sections 8 and 19(3) of the Electronic Transactions Law (2003 Revision) of the Cayman Islands shall not apply to this Agreement.

11.     <u>Governing Law</u>.    All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and shall be construed in accordance with, the laws of the Cayman Islands except in relation to the construction of the expressions "gross negligence", "moral turpitude" and "felony" in the definition of "Cause" below, which expression shall be construed in accordance with the laws of the State of Delaware in the United States of America.

12.     <u>Jurisdiction; Waiver of Jury Trial</u>.  Any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby (including claims for set-off and counter-claims and disputes regarding the validity, effect, interpretation or performance of all the legal relationships established by this Agreement or the LP Agreement or otherwise arising in connection with the foregoing) shall be finally settled by arbitration under the Rules of Arbitration of the International Chamber of Commerce. The number of arbitrators shall be one. The legal seat of arbitration shall be New York, New York. The arbitration shall be conducted in the English language. Each of the General Partner and Executive hereby waives any right it may have to trial by jury in respect of any litigation based on, arising out of, under or in connection with this Agreement or any course of conduct, course of dealing, verbal or written statement or action of any party hereto.

13.     <u>Compliance with Laws</u>.  The issuance of the Executive Units pursuant to this Agreement shall be subject to, and shall comply with, any applicable requirements of any United States and non-United States federal and state securities laws, rules and regulations and any other law or regulation applicable thereto.  The General Partner shall not be obligated to issue the Executive Units pursuant to this Agreement if any such issuance would violate any such laws, rules or regulations.

14.     <u>Binding Agreement; Assignment</u>.  The General Partner may, at any time assign and/or transfer any or all of its rights and entitlements under this Agreement to any person (including, without limitation, as contemplated by Section 5). This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the General Partner and its successors and assigns. Executive shall not assign or otherwise transfer any part of this Agreement without the prior written consent of the General Partner.

15.     <u>Rights of Executive</u>.  Nothing in this Agreement shall interfere with or limit in any way the right of the General Partner or any of the applicable subsidiaries to terminate Executive's service at any time (with or without Cause), nor confer upon Executive any right to continue in the employ of the Partnership or any of its subsidiaries for any period of time or to continue Executive's present (or any other) rate of compensation.

16.     <u>Acknowledgment of Executive</u>.  The award of the Executive Units does not entitle Executive to any benefit other than that granted under this Agreement.  Any benefits granted under this Agreement are not, to the maximum extent permitted by applicable law, part of

Executive's ordinary salary and shall not, to the maximum extent permitted by applicable law, be considered as part of such salary in the event of severance, redundancy or resignation.

17.    Counterparts.  This Agreement may be executed in one or more counterparts (including electronic counterparts), each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

18.    Further Assurances.  Each party hereto shall do and perform (or shall cause to be done and performed) all such further acts and shall execute and deliver all such other agreements, certificates, instruments and documents as either party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement.

19.    Severability.  The provisions of this Agreement shall be deemed severable.  The invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by applicable law.  Upon such determination that any provision, or the application of any such provision, is invalid, illegal, void or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible to the fullest extent permitted by applicable law in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the greatest extent possible.

20.    Certain Tax Matters.  The parties hereto intend that the Executive Units qualify as "profits interests" within the meaning of Revenue Procedures 93-27 and 2001-43 and other related official guidance promulgated by the Internal Revenue Service.  However, the General Partner makes no guarantee with respect to the tax treatment of the Executive Units hereunder, and Executive acknowledges that the General Partner makes no warranties as to any tax consequences regarding the Executive Units hereunder, and specifically agrees that the determination of any tax liability or other consequences associated with the issuance, holding, vesting or disposition of the Executive Units hereunder is Executive's sole and complete responsibility and that Executive shall pay all taxes, if any, assessed on the Executive Units or any payments in respect thereof under applicable law.

21.    Definitions.  For the purposes of this Agreement, the following terms have the meanings set forth below:

        (a)    "Cause" will have the meaning given to such term in an employment or other similar agreement entered into by Executive with the Partnership or any of its subsidiaries, or, in the absence of such an agreement, with respect to Executive, the occurrence of any of the following, as determined by the General Partner in good faith:    (i) Executive's willful misconduct or gross negligence in the performance of Executive's duties to the Partnership or any of its subsidiaries; (ii) Executive's willful failure to perform Executive's duties to the Partnership or any of its subsidiaries or to follow the lawful directives of the General Partner or any supervising employee (other than as a result of death or physical or mental incapacity); (iii) Executive's indictment for, conviction of, or pleading of guilty or nolo contendere to, a

13

felony or any crime involving moral turpitude; (iv) Executive's performance of any material act of theft, embezzlement, fraud, malfeasance, dishonesty or misappropriation of the Partnership's or any of its subsidiaries' property; (v) Executive's use of illegal drugs or Executive's abuse of alcohol that materially impairs Executive's ability to perform Executive's duties to the Partnership or any of its subsidiaries; (vi) Executive's material breach of any fiduciary duty owed to the Partnership or any of its subsidiaries (including, without limitation, the duty of care and the duty of loyalty); or (vii) Executive's material breach of any contract with the General Partner, the Partnership or any of its subsidiaries (including, without limitation, this Agreement), or a material violation of the code of conduct or other material written policy of the Partnership or any of its subsidiaries.

(b) "<u>LP Agreement</u>" means that certain First Amended and Restated Exempted Limited Partnership Deed, dated May 24, 2018, by and among the General Partner, One Equity Partners VI, L.P., and the members of the Partnership from time to time party thereto, as amended, supplemented or otherwise modified from time to time in accordance with its terms.

(c) "<u>Sale of the Partnership</u>" means the first to occur of (i) a transaction or series of transactions (including by way of merger, consolidation, or sale of equity) the result of which is that the holders of the Partnership securities immediately prior to such transaction(s) (on a fully diluted as if converted basis) and their affiliates are after giving effect to such transaction(s) no longer, in the aggregate, the "beneficial owners" (as such term is defined in Rule 13d-3 and Rule 13d-5 promulgated under the Securities Exchange Act of 1934, as amended), directly or indirectly through one or more intermediaries, of more than 50% of the Partnership securities (on a fully diluted as if converted basis), or (ii) the sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the Partnership's assets determined on a consolidated basis; <u>provided</u> that a merger, consolidation or other reorganization involving only the Partnership and/or its subsidiaries shall not be deemed a Sale of the Partnership.

## SIGNATURE PAGE TO GRANT AGREEMENT

**IN WITNESS WHEREOF,** the parties hereto have executed and delivered this Agreement as a Deed on the date first written above.

**EXECUTED as a DEED** by

**OEP VI General Partner, L.P.**
(on its own behalf, as general partner on behalf of the Partnership and as agent and/or attorney-in-fact for each Limited Partner of the Partnership)
By its general partner
OEP VI GP, Ltd.

By:_____
Name: Andrew Dunn
Title:   Authorized Signatory

in the presence of:              )

Witness                          )         *Marcia Spratt*
                                   _____

Name:      Marcia Spratt

Address:   510 Madison Ave.
           New York, NY  10022

**SIGNATURE PAGE TO GRANT AGREEMENT**
*(continued)*

**EXECUTED AS A DEED**

**EXECUTIVE**

**JOE MULLIS**

_____
Executive's Signature

Executive's Address

1152 Breakaway Dr.

Oceanside, CA 92057

State of Residence: Cel. Gorna
*(for purposes of the spousal consent set
forth on Exhibit B attached hereto)*

in the presence of:                    )

Witness                                )
_____
EVA Podsiadly
Name:

Address: 2124 Geneva Pl
Escondido CA 92027

## EXHIBIT A

## PROTECTIVE ELECTION TO INCLUDE MEMBERSHIP INTEREST IN GROSS INCOME PURSUANT TO SECTION 83(b) OF THE INTERNAL REVENUE CODE

On March 1, 2022, the undersigned executed an incentive partnership interest grant agreement (the "Grant Agreement") pursuant to which equity interests (the "Interests") in OEP Neology Cayman, L.P. (the "Partnership") were issued in connection with the provision of services by the undersigned to or for the benefit of the Partnership.  Pursuant to the Grant Agreement and the First Amended and Restated Exempted Limited Partnership Deed, dated May 24, 2018 (the "LP Agreement"), the holder of the Interests is entitled to an interest in Partnership capital exactly equal to the amount paid or to be paid therefor and an interest in Partnership profits, and so the Interests qualify as "profits interests" within the meaning of Revenue Procedure 93-27 as of the date that the Interests are issued.  If the relationship under the Grant Agreement ceases, then under certain circumstances the amount that the holder of the Interests will be entitled to receive as a result of a disposition of the Interests may be less than the fair market value thereof.  Hence, the Interests are subject to a substantial risk of forfeiture.

Based on Section 83 of the Internal Revenue Code of 1986, as amended (the "Code"), the Treasury Regulations promulgated thereunder, Treasury Regulation §1.721-1(b), Proposed Treasury Regulation §1.721-1(b)(1) and Revenue Procedures 93-27 and 2001-43, the undersigned believes that neither the undersigned's execution of the Grant Agreement nor the issuance of the Interests pursuant thereto is subject to the provisions of Section 83 of the Code. In the event that execution of the Grant Agreement or issuance of the Interests is so treated, however, the undersigned desires to have such execution or issuance taxed under the provisions of Section 83(b) of the Code at the time the undersigned executed the Grant Agreement and the Interests were issued.

Therefore, pursuant to Section 83(b) of the Code and Treasury Regulation §1.83-2 promulgated thereunder, the undersigned hereby makes an election, with respect to the Interests, to report as taxable income for the calendar year 2022 the excess (if any) of the value of the Interests on March 1, 2022 over the purchase price thereof. The undersigned hereby agrees to make such election within 30 days of the date of the Grant Agreement.

The following information is supplied in accordance with Treasury Regulation §1.83-2(e):

1.  The name, address and social security number of the undersigned is as follows:

Joe Mullis

1152 Breakaway Drive

Oceanside, CA 92057

Social Security No.: ██████████

A-1

2.  A description of the property with respect to which the election is being made:  The Interests, including any rights therein that the holder acquired upon the execution of the Grant Agreement and the LP Agreement.

3.  The date on which the property was transferred:  March 1, 2022.  The taxable year for which the election is made:  calendar year 2022.

4.  The restrictions to which the property is subject:  If the service relationship between the undersigned and the Partnership and its subsidiaries ends, then under certain circumstances the amount that the holder of the Interests will be entitled to receive as a result of a disposition of the Interests may be less than the fair market value thereof.

5.  The fair market value of the property with respect to which the election is being made, determined without regard to any lapse restrictions and in accordance with Revenue Procedure 93-27, on the date such property is transferred:  zero ($0).

6.  The amount paid for such property:  zero ($0).

**[END OF PAGE]**
**[SIGNATURE PAGE FOLLOWS]**

A-2

## SIGNATURE PAGE TO SECTION 83(b) ELECTION

A copy of this election has been furnished to the Partnership and each other person to whom a copy is required to be furnished pursuant to Treasury Regulation 1.83-2(d).

Signature: _____

Print Name:    JOE MULLIS

Dated: _____, 2022

A-3

## EXHIBIT B

### SPOUSAL CONSENT

The undersigned spouse of Executive hereby acknowledges that I have read the foregoing Incentive Partnership Interest Grant Agreement executed by Executive as of the date hereof and that I understand its contents. I am aware that the foregoing Incentive Partnership Interest Grant Agreement, together with the First Amended and Restated Exempted Limited Partnership Deed, dated May 24, 2018, of OEP Neology Cayman, L.P. provides for the sale or repurchase of my spouse's Incentive Partnership Interests under certain circumstances and imposes other restrictions on such securities (including, without limitation, restrictions on transfer). I agree that my spouse's interest in these securities is subject to these restrictions and any interest that I may have in such securities shall be irrevocably bound by these agreements and further, that my community property interest, if any, shall be similarly bound by this instrument.

Spouse's Signature:_____

Print Name:_____ Thompson_____

Dated:_____March_____/_____, 2022

Witness' Signature:_____

Print Name: EvA Podsiadly

Dated: March 1, 2022 , 2022

B-1