1  EMIL PETROSSIAN - State Bar No. 264222
2  epetrossian@glaserweil.com
   ALEXANDER R. MILLER - State Bar No. 294474
3  amiller@glaserweil.com
   GLASER WEIL FINK HOWARD
4    JORDAN & SHAPIRO LLP
   600 West Broadway, Suite 2850
5  San Diego, California 92101
   Tel.: (619) 765-4380
6  Fax: (619) 483-0646

7
   *Attorneys for Defendants*
8  NEOLOGY, INC., BRADLEY H. FELDMANN,
   OEP CAPITAL ADVISORS, L.P.,
9  OEP NEOLOGY CAYMAN, L.P., and
   OEP VI GENERAL PARTNER, L.P.
10

11  *Additional Counsel Listed on Signature Page*

12              UNITED STATES DISTRICT COURT

13            SOUTHERN DISTRICT OF CALIFORNIA

14

15  JOSEPH N. MULLIS,                    CASE NO. 3:25-cv-03247-JES-BJW

16              Plaintiff,               Hon. James E. Simmons, Jr.

17                                       **DEFENDANTS' MEMORANDUM**
18  v.                                   **OF POINTS AND AUTHORITIES**
                                         **IN SUPPORT OF MOTION TO**
19  NEOLOGY, INC., et al.,               **COMPEL ARBITRATION AND**
                                         **STAY PROCEEDINGS**
20              Defendants.
                                         *[Filed concurrently with Notice of*
21                                       *Motion and Declaration of Robert*
22                                       *Haney, Jr.]*

23                                       Date: January 28, 2026
24                                       Time: 9:00 a.m.
                                         Courtroom: 4B
25

26

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................... 1

II.   BACKGROUND ..................................................................................... 2

    A.    Plaintiff Enters into the Grant Agreements ......................................... 2

    B.    Plaintiff Brings Contract, Tort, and Statutory Claims that Depend on and Are Intertwined with the Grant Agreements ............................ 4

    C.    The Grant Agreements Govern All Claims Concerning Equity Compensation and Contain Clear Integration and Mandatory Arbitration Clauses. ............................................................................ 5

    D.    Relevant Procedural Background. ........................................................ 7

III.  ARGUMENT ............................................................................................ 7

    A.    Plaintiff's Claims Are Subject to Mandatory ICC Arbitration. ........... 7

        1.    Courts Rigorously Enforce Arbitration Agreements. ................. 7

        2.    An Agreement to Arbitrate Exists Under the New York Convention. .................................................................................. 9

        3.    The Broad Arbitration Provisions Cover All of Plaintiff's Claims. ..................................................................................... 10

            a.    Counts II, VII, IX, XIII – Claims Directly Implicating the Grant Agreements ................................... 12

            b.    Counts I, III, VII, VIII, X, XI, XII – Claims Concerning the Existence and Vesting of Equity Rights ............................................................................ 13

            c.    Counts IV, V, VI – Claims Concerning Alleged Pari Passu Rights .................................................... 16

        4.    All Arbitrability Questions Should Be Resolved in Defendants' Favor. ................................................................. 17

    B.    Plaintiff Cannot Evade Arbitration By Suing Nonsignatories ........... 17

        1.    Equitable estoppel applies in cases governed by the Convention. ................................................................................ 18

        2.    Plaintiff is bound by the arbitration agreement under estoppel principles. ................................................................. 20

        3.    The Grant Agreements Are Not Void, Inoperative, or Incapable of Being Performed. ................................................ 21

    C.    The Court Should Stay the Entire Action Pending Arbitration. ......... 22

IV.   CONCLUSION ...................................................................................... 24

1

## <u>TABLE OF AUTHORITIES</u>

2
<u>Page</u>

3
## <u>CASES</u>

4
*Am. Chung Nam, LLC v. Mitsui O.S.K. Lines, Ltd.*,
 2023 U.S. Dist. LEXIS 227709 (C.D. Cal. Dec. 19, 2023) ..................................... 19

5
*Ashbey v. Archstone Prop. Mgmt., Inc.*,
6
 785 F.3d 1320 (9th Cir. 2015) ................................................................................. 8

7
*Balen v. Holland Am. Line, Inc.*,
 583 F.3d 647 (9th Cir. 2009) ................................................................................... 9

8
*Bogicevic v. Seabourn Cruise Line Ltd.*,
9
 580 F. Supp. 3d 970 (W.D. Wash. 2022)............................................................ 8, 10

10
*Chloe Z Fishing Co. v. Odyssey Re (London) Ltd.*,
 109 F. Supp. 2d 1236 (S.D. Cal. 2000)..................................................................... 7

11
*City of Kenner v. Certain Underwriters at Lloyd's London*,
12
 2022 U.S. Dist. LEXIS 207623 (E.D. La. Nov. 16, 2022) ..................................... 10

13
*Daisley v. Blizzard Music Ltd. (US)*,
 |2017 U.S. Dist. LEXIS 66171 (C.D. Cal. May 1, 2017) ....................................... 17

14
*Day v. Orrick, Herrington & Sutcliffe, LLP*,
15
 42 F.4th 1131 (9th Cir. 2022) .................................................................................. 7

16
*DotC United, Inc. v. Google Asia Pac. Pte. Ltd.*,
 2023 U.S. Dist. LEXIS 75512 (N.D. Cal. May 1, 2023)......................................... 18

17
*Exp. Dev. Can. v. Custom Produce Sales*,
18
 2022 U.S. Dist. LEXIS 102151 (E.D. Cal. Jun. 7, 2022) ......................................... 8

19
*Ferguson v. Corinthian Colls., Inc.*,
 733 F.3d 928 (9th Cir. 2013) ................................................................................... 8

20
*Flextronics Int'l USA, Inc. v. Murata Mfg. Co.*,
21
 2020 U.S. Dist. LEXIS 158387 (N.D. Cal. Aug. 31, 2020) ................................... 10

22
*GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA LLC*,
 590 U.S. 432 (2020).......................................................................................... 11, 18

23
*Gsc Dev. v. Jinlong Indus. Co.*,
24
 2017 U.S. Dist. LEXIS 235508 (C.D. Cal. Dec. 4, 2017) ...................................... 23

25
*Kilgore v. KeyBank, N.A.*,
 673 F.3d 947 (9th Cir. 2012) ................................................................................. 22

26
*Leyva v. Certified Grocers of Cal. Ltd.*,
27
 593 F.2d 857 (9th Cir. 1979) ................................................................................. 23

28

Glaser Weil

ii

*Mitchell v. Tillett*,
    2016 U.S. Dist. LEXIS 153686 (N.D. Cal. Oct. 28, 2016) ................................... 10

*Mousebelt Labs Pte. Ltd. v. Armstrong*,
    674 F. Supp. 3d 728 (N.D. Cal. 2023) .................................................. 9, 19, 20, 21

*Mullen Techs., Inc. v. Qiantu Motor (Suzhou) Ltd.*,
    2020 U.S. Dist. LEXIS 116323 (S.D. Cal. July 1, 2020) ........................ 8, 9, 22, 23

*Mullis v. J.P. Morgan Chase & Co.*,
    2025 U.S. Dist. LEXIS 102441 (S.D. Cal. May 29, 2025)............................. 1, 7, 20

*Mundi v. Union Sec. Life Ins. Co.*,
    555 F.3d 1042, 1046 (9th Cir. 2009) ..................................................................... 19

*Nationwide Agribusiness Ins. Co. v. Buhler Barth GMBH*,
    2015 U.S. Dist. LEXIS 147717 (E.D. Cal. Oct. 29, 2015) .................................... 11

*Optimum Prods. v. HBO*,
    839 F. App'x 75 (9th Cir. 2020) ............................................................................ 11

*Peters v. Amazon Servs. LLC*,
    2 F. Supp. 3d 1165 (W.D. Wash. 2013) ................................................................ 16

*Piana v. Select Portfolio Servicing*,
    2018 Cal. Super. LEXIS 103698 (Cal. Super. Ct. Mar. 19, 2018) ........................ 13

*Rogers v. Royal Caribbean Cruise Line*,
    547 F.3d 1148 (9th Cir. 2008) ............................................................................... 22

*Setty v. Shrinivas Sugandhalaya LLP*,
    3 F.4th 1166 (9th Cir. 2021) .................................................................................. 19

*Simula, Inc. v. Autoliv, Inc.*,
    175 F.3d 716 (9th Cir. 1999) ................................................................................. 10

*Smith v. Spizzirri*,
    601 U.S. 472 (2024) ............................................................................................... 22

*Tech. & Intellectual Prop. Strategies Grp. PC v. Insperity, Inc.*,
    2012 U.S. Dist. LEXIS 170714 (N.D. Cal. 2012) ................................................. 22

*Tompkins v. 23andMe, Inc.*,
    840 F.3d 1016 (9th Cir. 2016) ............................................................................... 22

*Trajkovski Inv. AB v. I.Am.Plus Elecs., Inc.*,
    2021 U.S. Dist. LEXIS 247685 (C.D. Cal. Dec. 29, 2021) ................................... 10

*Translarity, Inc. v. Grand Junction Semiconductor PTE. Ltd.*,
    2024 U.S. Dist. LEXIS 196550 (N.D. Cal. Oct. 29, 2024) ................................... 23

*Wash. Mut. Fin. Group, LLC v. Bailey*,
    364 F.3d 260 (5th Cir. 2004) ................................................................................. 19

iii

*Wash. Sch. Risk Mgmt. Pool v. Am. Re-Insurance Co.*,
  2023 U.S. Dist. LEXIS 8013 (W.D. Wash. Jan. 17, 2023) ...................................... 23

*Wash. Sch. Risk Mgmt. Pool v. Am. Re-Insurance Co.*,
  2022 U.S. Dist. LEXIS 128390 (W.D. Wash. Apr. 20, 2022) ................................ 12

*Wolf v. Langemeier*,
  2010 U.S. Dist. LEXIS 87017 (E.D. Cal. Aug. 24, 2010)...................................... 23

*Youssefzadeh v. Global-Ip Cayman*,
  2018 U.S. Dist. LEXIS 239589 (C.D. Cal. Jul. 30, 2018)........................... 11, 13, 15

**<u>STATUTES</u>**

9 U.S.C. § 206.............................................................................................................. 2, 8, 24

9 U.S.C. § 208................................................................................................................. 23, 24

9 U.S.C. § 3......................................................................................................................... 2, 22

9 U.S.C. §§ 201-208 ............................................................................................................. 7

Cal. Labor Code §§ 200-204 ........................................................................................ 5, 14

Glaser Weil

## I.    <u>INTRODUCTION</u>

This motion arises from a dispute between Plaintiff Joseph N. Mullis and Defendants Neology, Inc. ("Neology"), its Chief Executive Officer Bradley H. Feldmann ("Feldmann"), and entities affiliated with One Equity Partners—OEP Neology Cayman, L.P. and OEP VI General Partner, L.P. (the "OEP Signatories") and OEP Capital Advisors, L.P. (together with the OEP Signatories, the "OEP Entities").

Plaintiff is a former Neology manager. As part of his equity compensation, Plaintiff twice executed Incentive Partnership Interest Grant Agreements (ECF Nos. 15-1 and 15-4, the "Grant Agreements") in which he agreed that any dispute connected to those agreements would be resolved and "finally settled" exclusively in International Chamber of Commerce ("ICC") arbitration proceedings seated in New York. These international, commercial arbitration agreements involve Cayman Islands entities, and therefore are enforceable under the New York Convention and the Federal Arbitration Act.

Rather than abide by his obligation to arbitrate, Plaintiff has filed a lawsuit that seeks to bypass clear arbitration requirements by repackaging arbitrable disputes as wage, tort, and statutory claims. Plaintiff cannot avoid arbitration in such a manner. Because Plaintiff's claims seek to enforce, depend on, and are inextricably intertwined with the Grant Agreements, the Court should compel arbitration and stay this case.

This is not the first time Plaintiff has attempted to litigate arbitrable issues in this Court against Neology. In a prior action brought by Plaintiff against Neology and others, this Court compelled arbitration under materially similar arbitration language and stayed the case. *See Mullis v. J.P. Morgan Chase & Co.*, 2025 U.S. Dist. LEXIS 102441 (S.D. Cal. May 29, 2025). The outcome here should be the same. Plaintiff's claims concerning alleged underpayment of equity benefits and the supposed pari passu co-investment arise from the same alleged compensation framework, and necessarily turn on rights and obligations governed (or superseded) by the Grant Agreements. And to the extent Plaintiff sues nonsignatories, equitable estoppel permits

1

Neology, Feldmann, and OEP Capital Advisors, L.P. to enforce the arbitration provisions because Plaintiff alleges collective misconduct, and his theories and claimed damages cannot be divorced from the Grant Agreements.

Accordingly, Defendants respectfully request an order compelling Plaintiff to proceed to ICC arbitration in New York pursuant to 9 U.S.C. § 206 and staying this action in its entirety pending arbitration under 9 U.S.C. § 3.

## II.    BACKGROUND

### A.    Plaintiff Enters into the Grant Agreements.

According to the Complaint, Plaintiff is a former Neology manager and worked for Defendants for nearly two decades. (Compl. at ¶ 15.) In or around 2014, Plaintiff entered into an Employment Agreement that provides for severance upon a termination without cause, conditioned on Plaintiff's execution of a release of claims. (*See* Haney Decl., Ex. 1.) Plaintiff nevertheless alleges that Defendants conditioned severance on an "onerous release that was not part of the Employment Agreement." (Compl. at ¶ 50.) Plaintiff further alleges this Employment Agreement governed until 2017, when a "significant shift" in the parties' relationship occurred. (Compl. at ¶ 16.) In 2017, the OEP Entities acquired Neology. (*Id*. at ¶ 17.) Plaintiff alleges he was then offered revised employment terms that reaffirmed the severance and bonus structure of the original agreement and added a new offer to participate in both a Management Equity Plan (or "MEP") and "a direct co-investment right 'pari passu' with OEP itself." (Compl. at ¶ 17.) Plaintiff alleges that Defendants asked for approval to "install [the new agreement] as of September," and that Plaintiff signaled his interest and readiness to proceed in August 2017. (*Id*. at ¶¶ 18-19). Plaintiff claims that, sometime thereafter, he accepted the revised Employment Agreement terms. (*Id*. at ¶ 20.)

Although not spelled out in Plaintiff's Complaint, what Plaintiff refers to as the "MEP" is reflected in, and governed in material part by, the Incentive Partnership Interest Grant Agreements first entered into by and among Plaintiff and the OEP Signatories in May 2018 (the "First Grant Agreement"). (*See* ECF No. 15-1, Ex. A.)

Along with the First Grant Agreement, the parties also entered into a Side Agreement and a Deed of Adherence. (*See* ECF Nos. 15-2 and 15-3.) In 2022, Plaintiff and the OEP Signatories entered into a second, smaller issuance memorialized in the second Incentive Partnership Interest Grant Agreement dated March 1, 2022 (the "Second Grant Agreement"). (*See* ECF No. 15-4, Ex. D.)

As to his supposed pari passu rights, Plaintiff acknowledges that he was never sent formalized documents for the pari passu opportunity, and the parties never entered into any subscription agreements documenting the purported rights. (*See* Compl. at ¶ 23.) Nor does the Employment Agreement contain any terms concerning such an investment. (*See* Haney Decl., Ex. 1.) Instead, Plaintiff's theory is that in or about September 2018, he was included on an internal spreadsheet setting forth proposed investment allocations for a pari passu co-investment right which allegedly reflected Defendants' affirmative confirmation of these otherwise undefined rights. (Compl. at ¶ 22.) As explained below, determining whether any such alleged pari passu promise survives—or is superseded by—the Grant Agreements is itself a dispute "arising out of or in connection with" those Agreements. (*See infra* § III(A)(3)(c).)

Plaintiff alleges that despite confirming his interest in the MEP and pari passu rights, Defendants "never followed through with the promised investment opportunity." (*See* Compl. at ¶ 23.) Instead, Plaintiff states that not long after he raised questions about these contractual rights, Defendants terminated his employment on September 26, 2022, which was made effective four days later. (*See id*. at ¶¶ 26, 29.)

Plaintiff further alleges that, upon his termination, Defendants presented him with a separation agreement that would have allegedly required him to forfeit his rights under the Grant Agreements. (*Id.* at ¶ 28.) The separation agreement, however, made no reference to the MEP or pari passu rights. (*See* Haney Decl., Ex. 2.) Instead, it offered payment of Plaintiff's accrued salary, twenty-six additional days of base salary, and any unreimbursed business expenses, conditioned on Plaintiff's acknowledgment that those sums constituted all compensation and benefits due to him and that he was

not entitled to any additional compensation or benefits from Neology. (*See id.* at ¶¶ 1.4, 1.6.) Plaintiff declined to sign, and alleges that, thereafter, he renewed his demand for his equity benefits. (Compl. at ¶ 30.)

Regarding the MEP, Plaintiff alleges that while Defendants allegedly confirmed the value of his fully vested shares as $524,807 in July 2022, upon termination, he was not paid the full amount as supposedly required and instead was only offered a $185,000 payout, allegedly representing a unilateral decision by Defendants that the fair market value of Plaintiff's equity interest was $0. (*See* Compl. at ¶¶ 24-25, 30-31.) Regarding the pari passu investment rights, Plaintiff states that despite his requests, he was never given a chance to participate and that Defendants' counsel ultimately denied the existence of the rights. (*Id.* at ¶ 30.)

Plaintiff acknowledges that his termination was part of a restructuring but takes the position that the restructuring was pretextual because the separation agreement required Plaintiff to give up his alleged rights and benefits to equity compensation. (*Id.* at ¶¶ 26, 29.)

### B. **Plaintiff Brings Contract, Tort, and Statutory Claims that Depend on and Are Intertwined with the Grant Agreements.**

Based on the foregoing allegations, Plaintiff asserts thirteen contract, tort, and statutory claims. (*See* Compl.) Specifically, he alleges breach of his Employment Agreement, the Grant Agreements, and unspecified agreements (and, in the alternative, a claim for Common Counts) based on: (1) Defendants' alleged failure to pay out Plaintiff's bonus and severance and conditioning of such payment on a separation agreement that required Plaintiff to give up rights under the Grant Agreements; (2) Defendants' alleged failure to pay out the full vested MEP amount; and (3) Defendants' alleged failure to tender subscription documents or otherwise provide Plaintiff the opportunity to co-invest pari passu with the OEP Entities. (*See* Compl. at ¶¶ 45-58, 70-76, 91-100, 145-153.)

Plaintiff further alleges that the failure to pay out the vested MEP interest in full amounts to a violation of Cal. Labor Code §§ 200-204, conversion, and civil theft, and that the ultimate failure to follow through with allegedly promised pari passu rights gives rise to claims for fraud and promissory estoppel. (*See* Compl. at ¶¶ 59-69, 77-90, 117-138.)

With respect to his unfair competition claim, Plaintiff states that the failure to pay out earned wages (defined to include vested MEP interest), coupled with conditioning payment obligations on the execution of an overbroad release that required forfeiture of equity compensation, the underpayment of MEP equity, and denying the existence of a pari passu opportunity, all amount to unfair, unlawful, and fraudulent business acts or practices. (Compl. at ¶¶ 139-144.)[1]

As for his retaliation and whistleblower claim, Plaintiff asserts that after making his complaints and demands about his contractual rights, including his rights under the Grant Agreements, he was terminated. (*Id.* at ¶¶ 102-104.) Plaintiff alleges that his inquiries contributed to the adverse action, highlighting that Defendants sought to require Plaintiff to sign a separation agreement that would have allegedly required him to give up the very rights he inquired about. (*Id.* at ¶¶ 104-105.)

Finally, Plaintiff seeks a declaration that he was entitled to the full vested MEP amount and pari passu investment opportunity. (*Id.* at ¶¶ 108-116.)

**C.    The Grant Agreements Govern All Claims Concerning Equity Compensation and Contain Clear Integration and Mandatory Arbitration Clauses.**

The Grant Agreements govern all aspects of Plaintiff's equity compensation with Defendants both directly and through the broad integration clauses. (*See* ECF Nos. 15-1, 15-4.) Both Grant Agreements set forth the amount of interest provided to

---

[1] Plaintiff also alleges that the unfair conduct includes the use of Plaintiff's personal credit card which is not relevant to this Motion since the claim should be sent to arbitration in its entirety.

**DEFS.' MEM. IN SUPPORT OF MOT. TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

Plaintiff thereunder; the vesting schedule, whereby interest vested in equal installments "on each of the first five (5) anniversaries of July 1, 2017," provided that he remained employed; forfeiture considerations; and repurchase rights for fair market value. (*See* ECF No. 15-1, Ex. A at § 2; ECF No. 15-4, Ex. D at § 2.) Further, each Grant Agreement provides that it is "the entire agreement between the parties hereto with respect to the subject matter contained herein," namely, Plaintiff's equity compensation and incentive arrangements with Defendants, and "supersedes all prior agreements or prior understandings, whether written or oral, between the parties hereto relating to such subject matter." (*See* ECF No. 15-1, Ex. A at § 9; ECF No. 15-4, Ex. D at § 9.) Plaintiff does not identify any other written agreement governing his alleged equity rights.

The Grant Agreements contain broad arbitration provisions. Section 12 of both Grant Agreements states:

> Any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby (including claims for set-off and counter-claims and disputes regarding the validity, effect, interpretation or performance of all the legal relationships established by this Agreement or the LP Agreement or otherwise arising in connection with the foregoing) shall be finally settled by arbitration under the Rules of Arbitration of the International Chamber of Commerce. The number of arbitrators shall be one. The legal seat of arbitration shall be New York, New York. The arbitration shall be conducted in the English language. Each of the [Defendants] and [Plaintiff] hereby waives any right it may have to trial by jury in respect of any litigation based on, arising out of, under or in connection with this Agreement or any course of conduct, course of dealing, verbal or written statement or action of any party hereto.

(*See* ECF No. 15-1, Ex. A at § 12; ECF No. 15-4, Ex. D at § 12.)

As set forth below, the Grant Agreements are commercial in nature, provide for ICC arbitration seated in the United States, and include Cayman Islands signatories. Thus, they are international commercial arbitration agreements enforceable under the

1  Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the

2  "New York Convention" or "Convention") and the Federal Arbitration Act ("FAA").

3  **D.    Relevant Procedural Background.**

4  This is not the first time Plaintiff has attempted to litigate arbitrable issues in

5  this Court. In *Mullis v. J.P. Morgan Chase & Co. et al.*, Plaintiff asserted similar claims

6  against Neology and other entities arising out of his alleged equity rights and the

7  alleged loss of value of those interests. In that case, after considering arbitration

8  agreements containing substantially similar language to the ones at issue here, the

9  Court granted Neology's and the other defendants' joint motion to compel arbitration

10  in full and stayed the action pending arbitration. *See Mullis v. J.P. Morgan Chase &*

11  *Co.*, 2025 U.S. Dist. LEXIS 102441, at *17 (S.D. Cal. May 29, 2025).

12  On September 25, 2025, Plaintiff filed the Complaint initiating the instant action

13  as *Joseph N. Mullis v. Neology, Inc., et al.*, Case No. 25-CU-051830C, in the San Diego

14  County Superior Court (the "State Court Action"). On December 1, 2025, the OEP

15  Signatories timely filed for removal to this Court. (ECF No. 1.) All Defendants now

16  move to compel arbitration and to stay this action pending arbitration.

17  **III.    ARGUMENT**

18  **A.    Plaintiff's Claims Are Subject to Mandatory ICC Arbitration.**

19  **1.    Courts Rigorously Enforce Arbitration Agreements.**

20  "Congress enacted Chapter Two of the [FAA], *see* 9 U.S.C. §§ 201-208, to

21  provide for the effective and efficient resolution of international arbitral disputes after

22  the United States entered into the United Nations Convention on the Recognition and

23  Enforcement of Foreign Arbitral Awards (New York, June 1958) ('the New York

24  Convention' or 'Convention')." *Day v. Orrick, Herrington & Sutcliffe, LLP*, 42 F.4th

25  1131, 1133 (9th Cir. 2022). Federal policy creates a strong presumption favoring

26  enforcement of arbitration agreements, and that policy "'applies with special force in

27  the field of international commerce.'" *See Chloe Z Fishing Co. v. Odyssey Re (London)*

28  *Ltd.*, 109 F. Supp. 2d 1236, 1241 (S.D. Cal. 2000). By its terms, the FAA "leaves no

7

Glaser
Weil

place for the exercise of discretion by a district court, but rather mandates that district courts shall direct the parties to proceed to arbitration on issues to which an arbitration agreement has been signed." *Mullis*, 2025 U.S. Dist. LEXIS 102441, at *8.

Generally, in deciding whether to compel arbitration under the FAA, a court must determine two issues: (1) whether there is an agreement to arbitrate; and (2) whether the agreement covers the dispute. *See Ashbey v. Archstone Prop. Mgmt., Inc*., 785 F.3d 1320, 1323 (9th Cir. 2015). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Ferguson v. Corinthian Colls., Inc*., 733 F.3d 928, 938 (9th Cir. 2013) (internal citations omitted).

Under the Convention, "[c]ourts determining whether to compel arbitration . . . should conduct a 'very limited inquiry.'" *Bogicevic v. Seabourn Cruise Line Ltd*., 580 F. Supp. 3d 970, 974 (W.D. Wash. 2022); *Exp. Dev. Can. v. Custom Produce Sales*, 2022 U.S. Dist. LEXIS 102151, at *9 (E.D. Cal. Jun. 7, 2022) (a court performs a very limited inquiry into whether an arbitration agreement exists and falls within the Convention's coverage). "'Under Chapter 2 of the FAA, courts apply a two-step analysis' when a party moves to compel arbitration pursuant to an agreement governed by the Convention." *Id*. "First, the court analyzes four preliminary questions to determine whether an arbitration agreement exists that falls under the Convention." *Id*. Second, "[i]f the court finds the existence of such an agreement, it must order arbitration unless it finds the agreement 'null and void, inoperative or incapable of being performed' under the Convention." *See Mullen Techs., Inc*., 2020 U.S. Dist. LEXIS 116323, at *7; *Mullis*, 2025 U.S. Dist. LEXIS 102441, at *9 (same). The Court "may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." 9 U.S.C. § 206.

As set forth below, no matter which test—either that of the FAA or the Convention—is applied, all elements are satisfied. ***First***, an agreement to arbitrate exists, which falls under the Convention. (*See infra* § III(A)(2).) ***Second***, Plaintiff's

claims are covered by the broad arbitration provisions in the Grant Agreements. (*See infra* § III(A)(3).) ***Third***, all questions on arbitrability must be resolved in Defendants' favor. (*See infra* § III(A)(4).) ***Fourth***, Plaintiff cannot evade arbitration against Defendants under the equitable estoppel doctrine, which applies to agreements governed by the Convention. (*See infra* § III(B)(1)-(2).) ***Fifth***, and finally, there are no grounds to find the arbitration agreements void, inoperative, or incapable of being performed. (*See infra* § III(B)(3).) Thus, Plaintiff should be compelled to arbitrate his claims as stated in the agreements he signed, and this action should be stayed pending arbitration.

## 2.    An Agreement to Arbitrate Exists Under the New York Convention.

An agreement "falls under the Convention" if it meets four requirements: (1) there is a written agreement to arbitrate; (2) the agreement is commercial in nature; (3) the agreement provides for arbitration in the territory of a Convention signatory; and (4) a party to the agreement is a foreign citizen or entity, or the commercial relationship has some reasonable relation with one or more foreign states. *See Mullen Techs., Inc.,* 2020 U.S. Dist. LEXIS 116323, at *7; *Balen v. Holland Am. Line, Inc.,* 583 F.3d 647, 654-55 (9th Cir. 2009). All four elements are met here.

***First***, the written agreements Plaintiff signed each contain "an arbitral clause in a contract or an arbitration agreement[.]" *Mousebelt Labs Pte. Ltd. v. Armstrong*, 674 F. Supp. 3d 728, 734 (N.D. Cal. 2023). Specifically, Section 12 of the Grant Agreements requires that "[a]ny suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby . . . shall be finally settled by arbitration under the Rules of Arbitration of the International Chamber of Commerce," and "[t]he legal seat of arbitration shall be New York, New York." (*See* ECF No. 15-1, Ex. A at § 12; ECF No. 15-4, Ex. D at § 12.) Thus, there are written agreements to arbitrate.

DEFS.' MEM. IN SUPPORT OF MOT. TO COMPEL ARBITRATION AND STAY PROCEEDINGS

***Second***, the Grant Agreements are commercial in nature because they relate to equity incentive compensation and business transactions for economic gain. *See Trajkovski Inv. AB v. I.Am.Plus Elecs., Inc*., 2021 U.S. Dist. LEXIS 247685, at *8 (C.D. Cal. Dec. 29, 2021) (finding agreement for purchase of stock commercial in nature under the Convention); *see also Mitchell v. Tillett*, 2016 U.S. Dist. LEXIS 153686, at *2 (N.D. Cal. Oct. 28, 2016) (agreement that flowed from course of employment was commercial under the Convention); *Flextronics Int'l USA, Inc. v. Murata Mfg. Co*., 2020 U.S. Dist. LEXIS 158387, at *51 (N.D. Cal. Aug. 31, 2020) ("[T]he SMIA involves a commercial relationship, as it relates to 'business transactions[.]'").

***Third***, the Grant Agreements require arbitration in the United States—a signatory to the Convention. *See, e.g.*, *Bogicevic*, 580 F. Supp. 3d at 976 (arbitration agreement identified United States as location); *City of Kenner v. Certain Underwriters at Lloyd's London*, 2022 U.S. Dist. LEXIS 207623, at *7 (E.D. La. Nov. 16, 2022) (compelling arbitration under Convention where location of the arbitration is United States).

***Fourth***, the OEP Signatories, both parties to the Grant Agreements and Defendants here, are organized under the laws of the Cayman Islands and are therefore citizens of the Cayman Islands. *See Mousebelt Labs Pte. Ltd.*, 674 F. Supp. 3d at 735 ("MouseBelt is organized under the laws of Singapore and is therefore a citizen of Singapore.").

Accordingly, all four requirements are met. The Grant Agreements therefore satisfy the first prong of both the general FAA and the FAA Chapter 2 factors, thus supporting an order compelling arbitration.

### 3. The Broad Arbitration Provisions Cover All of Plaintiff's Claims.

The arbitration provisions in the Grant Agreements are broad and plainly cover the disputes at issue. The Ninth Circuit applies an expansive construction to arbitration

provisions that, like those here, apply to all disputes "arising in connection with" the agreement. *See Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716, 720 (9th Cir. 1999) (arbitration clause stating that it applies to "all disputes arising in connection with this Agreement" must be interpreted expansively). "Thus, when an arbitration agreement employs the phrase 'in connection with,' a party's factual allegations 'need only 'touch matters' covered by the contract containing the arbitration clause' in order for the court to require arbitration." *Nationwide Agribusiness Ins. Co. v. Buhler Barth GMBH,* 2015 U.S. Dist. LEXIS 147717, at *16 (E.D. Cal. Oct. 29, 2015); *see also Optimum Prods. v. HBO,* 839 F. App'x 75, 78 (9th Cir. 2020) (affirming order compelling arbitration because arbitration clause was "broad" and applied to any disputes "arising out of" the agreement). The "touch matters" test does not require that a claim have a contractual interpretation element. *Youssefzadeh v. Global-Ip Cayman,* 2018 U.S. Dist. LEXIS 239589, at *15 (C.D. Cal. Jul. 30, 2018)[2]. Instead, it is enough that the claim is merely collateral to the agreement, interpretation, or business relationship formed by the contract. *Id.*

As set forth more fully below, all of Plaintiff's claims come within this broad scope. They break into three categories. ***First***, Plaintiff asserts breach of contract and related claims seeking to enforce the very agreements containing the arbitration clauses (the Grant Agreements). (*See infra* § III(A)(3)(a).) ***Second***, Plaintiff advances a slew of claims that either expressly ask the Court to determine the existence, value, vesting, and forfeiture of Plaintiff's benefits under the Grant Agreements, or would require the Court to resolve those same questions implicitly. (*See infra* § III(A)(3)(b).) ***Third***, Plaintiff's pari passu claims arise from, and are inextricably intertwined with, the equity rights and obligations governed by the Grant Agreements through their

---

[2] The holding in *Youssefzadeh* that a non-signatory cannot enforce an arbitration agreement under the Convention predates the Supreme Court's decision in *GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless, USA, LLC,* 590 U.S. 432 (2020), discussed below in Section III.D.

DEFS.' MEM. IN SUPPORT OF MOT. TO COMPEL ARBITRATION AND STAY PROCEEDINGS

integration clauses. (*See infra* § III(A)(3)(c).) Indeed, the trier of fact must decide whether any agreement concerning pari passu rights was incorporated into the Grant Agreements—and, if so, whether those claims are superseded by the Agreements' terms.

In short, as each of Plaintiff's claims either requires interpreting and enforcing the Grant Agreements or else arises from the contractual relationship those Agreements created, this dispute belongs in arbitration, not in this Court.

a. <u>Counts II, VII, IX, XIII – Claims Directly Implicating the Grant Agreements</u>

Four of Plaintiff's claims derive directly from the Grant Agreements. In Count II, Plaintiff alleges that Defendants breached a contract with Plaintiff governing his MEP rights by allegedly failing to provide him his full vested equity upon termination. (Compl. at ¶¶ 52-58.) Plaintiff omits from pleading that the "written contract governing Plaintiff's MEP rights" are the Grant Agreements at issue in the instant motion. Because this breach of contract claim will require the factfinder to construe the terms of the Grant Agreements and analyze the parties' respective rights thereunder, it directly "arises out of" and is "connect[ed] with" the Grant Agreements. *See Wash. Sch. Risk. Mgmt. Pool v. Am. Re-Insurance Co.*, 2022 U.S. Dist. LEXIS 128390, at *17 (W.D. Wash. Apr. 20, 2022) ("breach of contract claim asks the Court to construe the terms of the Sompo Policy and analyze the parties' respective rights under the Policy. It therefore touches matters covered by the Policy such that it should be arbitrated.")

Similarly, in Count VII, Plaintiff alleges that Defendants breached the implied covenant in the Grant Agreements by failing to pay out the entire vested equity. (Compl. at ¶¶ 91-100.) Thus, this claim also arises out of the Grant Agreements, whether premised on an implied term or not.[3] *See Piana v. Select Portfolio Servicing,*

---

[3] Count XIII for Common Counts is brought in the alternative to Plaintiff's contract claims, but it too is based on the Grant Agreements. (*See* Compl. ¶¶ 145-153.)

2018 Cal. Super. LEXIS 103698, at *4 (Cal. Super. Ct. Mar. 19, 2018) (implied covenant rests upon the existence of a contract).

Finally, Count IX, a claim for declaratory relief, directly asks the Court to assess Plaintiff's rights under the Grant Agreements. (*See* Compl. at ¶ 109 ("An actual, present controversy exists between Plaintiff and Defendants concerning their respective rights and duties under written instruments and contracts, including . . . the written Management Equity Plan documents[.]").) Because this claim also explicitly asks for the Court to consider the Grant Agreements and the parties' rights thereunder, it "touches" those agreements and must be sent to arbitration as well.

    b. <u>Counts I, III, VII, VIII, X, XI, XII – Claims Concerning the Existence and Vesting of Equity Rights</u>

Counts I, III, VII, VIII, X, XI, and XII each require the Court to assess the substance and scope of Plaintiff's equity rights under the Grant Agreements and the vesting thereof, and, therefore, necessarily require the Court to consider, interpret, and construe the Grant Agreements. *See id.* at *16; *Youssefzadeh*, 2018 U.S. Dist. LEXIS 239589, at *15.

For example, several of Plaintiff's claims require the Court to assess Plaintiff's argument that Defendants attempted to extinguish their alleged obligations under the Grant Agreements through proffer of a separation agreement that, if signed, would have forfeited Plaintiff's equity rights under the Grant Agreements. Count I alleges breach of Plaintiff's Employment Agreement, in part, based on Defendants' failure to pay out six months of severance upon termination. (*See* Compl. at ¶¶ 45-51.) But the Employment Agreement explicitly conditions the severance payment on Plaintiff's execution of a separation agreement that Plaintiff admittedly did not sign. (*See* Haney

---

Specifically, Plaintiff alleges that "[a]s to the Management Equity Plan, in early 2022 Defendants provided a written valuation of Plaintiff's vested equity of $524,807. Defendants paid only $185,000 and retained the unpaid balance, which in equity and good conscience belongs to Plaintiff." (Compl. at ¶ 148.)

DEFS.' MEM. IN SUPPORT OF MOT. TO COMPEL ARBITRATION AND STAY PROCEEDINGS

Decl., Ex. 1.) Related to this requirement, throughout the Complaint, Plaintiff alleges that the separation agreement would have allegedly required him to "forfeit[], among other things, . . . the MEP benefits," suggesting the separation agreement as presented is improper. (Compl. at ¶¶ 28, 48.) Put another way, Plaintiff claims that conditioning severance on execution of the separation agreement was improper because it required him to relinquish rights and benefits owed to him under the Grant Agreements, in particular, the alleged value of the equity (at least $524,807) issued to him under the same agreements. (*Id.* at ¶¶ 28, 53.)[4] In his claim for breach of the implied covenant (Count VII) Plaintiff similarly argues that Defendants breached the implied covenant in the Employment Agreement by "conditioning severance on execution of a broad release" that required Plaintiff to give up his rights under the Grant Agreements. (Compl. at ¶¶ 91-100.) This means that, like Count I, Plaintiff's substantiation of his claims will necessarily require the factfinder to assess Plaintiff's rights as set forth and governed by the Grant Agreements. That question is plainly for an arbitrator, as it will require interpretation of the Grant Agreements' terms, including those on vesting, repurchase, and forfeiture.

Further, Counts III, X, XI, and XII each also require the Court to determine the value of Plaintiff's equity pursuant to the Grant Agreements and what amount of it was due to Plaintiff, if any. Specifically, Count III alleges that Defendants failed to pay earned wages pursuant to Lab. Code §§ 200-204, defining wages to include the alleged value of vested equity conferred by the Grant Agreements. (Compl. at ¶ 61.) To evaluate this claim, the Court must assess both whether the equity awarded pursuant to the Grant Agreements constitutes a wage and whether the full vested amount was "earned" such that it was owed to Plaintiff. Plaintiff's claim for conversion, Count X, similarly concerns, in part, the alleged failure of Defendants to pay out Plaintiff's

---

[4] Defendants reserve all rights to contest this argument, including by noting that nothing imposes any prohibition on particular terms in the separation agreement.

equity incentives under the Grant Agreements. (Compl. at ¶¶ 118, 120, 124-127.)
Among other things, Plaintiff alleges that he owned vested equity in a sum certain, that
Defendants "exercised dominion over a specific portion of that sum," that Plaintiff did
not consent to Defendants' retention of the unpaid balance, that Plaintiff demanded
Defendants deliver the unpaid balance, and that Plaintiff suffered harm in the amount
of the unpaid balance. (*Id.* at ¶¶ 118-128.) Count XI (civil theft) and Count XII (unfair
competition) similarly allege Defendants withheld Plaintiff's vested equity under the
Grant Agreements. (Compl. at ¶¶ 130, 133, 135, 137, 140.)[5] Thus, each of these
allegations necessarily touches on the terms of the Grant Agreements, which govern
Plaintiff's right, if any, to equity benefits and the vesting schedule of the same.

Finally, Count VIII is a retaliation claim where the Grant Agreements are, again,
at the very core of the dispute. According to Plaintiff, he was retaliated against—*i.e.*,
terminated—after inquiring about his equity compensation under the Grant
Agreements. (*Id.* at ¶¶ 30, 102-107.) This means that the existence of the Grant
Agreements led Plaintiff to undertake the actions he alleges resulted in his termination
and ultimately this lawsuit. *See Youssefzadeh*, 2018 U.S. Dist. LEXIS 239589, at *9
(agreement was at the core of the dispute because it created and defined the legal
relationships and it was the conflicted nature of those relationships that led plaintiff to
take the actions resulting in termination). Further, Plaintiff's theory of liability rests on
the assertion that his termination was pretextual. (*See* Compl. at ¶ 26.) In support, he
relies on the separation agreement, which he contends required him to relinquish rights
and benefits allegedly owed to him under the Grant Agreements. (*Id.* at ¶¶ 28–29, 105.)
But whether the separation agreement evidences pretext turns on a predicate question:
whether the Grant Agreements entitled Plaintiff to the equity rights he alleges. As

---

[5] In Count XII, Plaintiff also alleges that it was unfair, unlawful, and fraudulent for
Plaintiff to condition payment obligations on execution of an overbroad release that
required giving up the MEP benefits and failing to pay out earned wages, including the
equity benefits. (Compl. at ¶¶ 139-144.) For these reasons too this claim is subject to
arbitration.

1  previously explained, that entitlement question requires interpretation of the Grant

2  Agreements and, therefore, is subject to mandatory arbitration and cannot be

3  adjudicated by this Court in the first instance.

4            c.    Counts IV, V, VI – Claims Concerning Alleged Pari Passu

5                  Rights

6        Counts IV, V, and VI all implicate whether and to what extent Plaintiff had a

7  right to co-invest pari passu to OEP into Neology. (*See* Compl. at ¶¶ 70-76 (Count IV,

8  alleging breach of contract concerning the failure to provide pari passu rights); *id.* at

9  ¶¶ 77-85 (Count V, alleging fraud concerning the opportunity to invest pari passu to

10 OEP); *id.* at ¶¶ 86-90 (Count VI, alleging promissory estoppel related to the

11 opportunity to invest pari passu to OEP).) These inquiries are also necessarily subject

12 to the Grant Agreements. Plaintiff's alleged pari passu rights are part and parcel of his

13 equity compensation, which the Grant Agreements govern. (*See, e.g.*, Compl. at ¶ 17;

14 ECF Nos. 15-1, 15-4.) Indeed, the Grant Agreements each contain an integration

15 clause which states that they represent the entire agreement with respect to the subject

16 matter therein—namely, Plaintiff's equity compensation—and accordingly cover not

17 only Plaintiff's alleged MEP rights but also the pari passu rights which were never

18 memorialized in writing. *See Peters v. Amazon Servs. LLC*, 2 F. Supp. 3d 1165, 1173

19 (W.D. Wash. 2013) (using an integration clause to bring claims within the scope of an

20 arbitration agreement).[6] Specifically, the Grant Agreements provide that they: "contain

21 the entire agreement between the parties hereto with respect to the subject matter

22 contained herein, and ***supersede[] all prior agreements or prior understandings,***

23 ***whether written or oral, between the parties***." (ECF No. 15-1, Ex. A at § 9; ECF No.

24

---

25 [6] To the extent there is any doubt, this Court need look no further than Plaintiff's own
   allegations, in which he presents his MEP rights and pari passu rights as all part of the
26 same employment arrangement with Defendants. (*See* Compl. at ¶ 17 ("As part of the
   updated terms [for employment], Mr. Mullis was offered both participation in a
27 Management Equity Plan ('MEP') and a direct co-investment right 'pari passu' with
   OEP itself.").)
28

DEFS.' MEM. IN SUPPORT OF MOT. TO COMPEL ARBITRATION AND STAY PROCEEDINGS

15-4, Ex. D at § 9 (emphasis added).) Plaintiff alleges that the pari passu opportunity was "confirm[ed]" in a spreadsheet from September 2018. (Compl. at ¶ 22.) But Plaintiff entered into the Second Grant Agreement with an integration clause in March 2022. (*See* ECF No. 15-4, Ex. D.) Therefore, at a minimum, Plaintiff's claims related to the alleged pari passu opportunity necessarily require a finding as to whether the integration clause in the Second Grant Agreement superseded "all prior agreements or prior understandings" regarding the pari passu opportunity.

At minimum the arbitrator must decide whether the Grant Agreements' integration clause superseded any alleged prior oral or informal pari passu promise—an issue of contract interpretation that falls squarely within Section 12's "arising out of or in connection with" language. (*see* ECF No. 15-1, Ex. A at § 12; ECF No. 15-4, Ex. D at § 2.)

### 4. All Arbitrability Questions Should Be Resolved in Defendants' Favor.

To the extent the Court has any doubt on arbitrability of the foregoing claims, "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Ferguson*, 733 F.3d at 938 (holding that terms in enrollment agreement requiring arbitration of "any dispute" and "all claims" "arising from my enrollment" covered claims that the school misrepresented the value and cost of an education); *see also Daisley v. Blizzard Music Ltd. (US)*, 2017 U.S. Dist. LEXIS 66171, at *18 (C.D. Cal. May 1, 2017) ("Keeping in mind that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration,' the Court concludes that plaintiff's fraud claim . . . touch[es] and arise[s] from the Songwriter Agreements."). Accordingly, this favors arbitration of Plaintiff's claims, which all implicate the Grant Agreements in one form or another, as well.

### B. <u>Plaintiff Cannot Evade Arbitration By Suing Nonsignatories.</u>

In each of his claims, Plaintiff has sued *all* Defendants, including both signatories to the agreement and nonsignatories, without differentiating between them

or parsing who did what. (*See generally* Compl.) But this does not defeat the arbitration requirement. In fact, it does the opposite. As set forth below, each Defendant is entitled to compel arbitration as to claims against them. Signatories may do so directly, while non-signatories may do so through the doctrine of equitable estoppel.

### 1.    Equitable estoppel applies in cases governed by the Convention.

The Supreme Court has held that nonsignatories to an arbitration agreement may invoke the equitable estoppel doctrine to compel arbitration in cases falling under the Convention. *See GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 442 (2020) ("Nothing in the drafting history suggests that the Convention sought to prevent contracting states from applying domestic law that permits nonsignatories to enforce arbitration agreements in additional circumstances."); *see also Day*, 42 F.4th at 1135-36 (explaining that, in *GE Energy*, the Supreme Court determined that the domestic doctrine of equitable estoppel "does not conflict with the Convention, and so is applicable in international arbitrations"); *see Mullis*, 2025 U.S. Dist. LEXIS 102441, at *16 ("Equitable estoppel generally allows a nonsignatory to enforce the arbitration clause of an agreement against a signatory bringing claims against it when the claims rely on terms of the agreement.").

To decide whether a nonsignatory may compel arbitration in a case under the Convention, courts apply federal common law rather than state law. *See Mousebelt Labs Pte. Ltd.*, 674 F. Supp. 3d at 738 ("[C]ourts should apply federal common law 'in determining the arbitrability of federal claims by or against non-signatories to an arbitration agreement.'"); *DotC United, Inc. v. Google Asia Pac. Pte. Ltd.*, 2023 U.S. Dist. LEXIS 75512, at *7-8 (N.D. Cal. May 1, 2023) ("[T]he Court finds federal substantive law governs the arbitrability question in this action brought under the New York Convention given 'the need for uniformity in the application of international arbitration agreements.'").

DEFS.' MEM. IN SUPPORT OF MOT. TO COMPEL ARBITRATION AND STAY PROCEEDINGS

1    Equitable estoppel precludes a party from claiming the benefits of a contract
2  while simultaneously attempting to avoid the burdens that the contract imposes. *Mundi*
3  *v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1046 (9th Cir. 2009) (citing *Wash. Mut.*
4  *Fin. Group, LLC v. Bailey*, 364 F.3d 260, 267 (5th Cir. 2004)). Under Ninth Circuit
5  common law, equitable estoppel applies when "'the subject matter in dispute [is]
6  intertwined with the contract providing for arbitration.'" *Mousebelt Labs Pte. Ltd.*, 674
7  F. Supp. 3d at 741 (*citing Setty v. Shrinivas Sugandhalaya LLP*, 3 F.4th 1166, 1169
8  (9th Cir. 2021)). Specifically, a signatory may be required to arbitrate a claim brought
9  by a nonsignatory "because of the close relationship between the entities involved, as
10  well as the relationship of the alleged wrongs to the non-signatory's obligations and
11  duties in the contract and the fact that the claims were intertwined with the underlying
12  contractual obligations." *Mundi*, 555 F.3d at 1046.

13    The intertwinement standard is satisfied where the plaintiff's claims are
14  predicated on rights that exist "only by virtue" of the contracts containing arbitration
15  provisions, and the harm allegedly suffered "cannot be divorced from" those rights.
16  *See Mousebelt Labs Pte. Ltd.*, 674 F. Supp. 3d at 742. The standard also is satisfied
17  "where the signatory raises allegations of collusive misconduct between the
18  nonsignatory and other signatories." *Id*. "That is, a subject matter in dispute may be
19  properly characterized as intertwined with the contract providing for arbitration where
20  the signatory must rely on the terms of the written agreement in asserting its claims
21  against the nonsignatory, or where the signatory raises allegations of collusive conduct
22  between the nonsignatory and other signatories." *Id*.; *accord Am. Chung Nam, LLC v.*
23  *Mitsui O.S.K. Lines, Ltd*., 2023 U.S. Dist. LEXIS 227709, at *21 (C.D. Cal. Dec. 19,
24  2023) ("Under federal common law, equitable estoppel requires that the subject matter
25  of the dispute be 'intertwined with the contract providing for arbitration.' . . . This
26  standard is satisfied where a signatory 'raises allegations of collusive misconduct
27  between the nonsignatory and other signatories.'").

28    As set forth below, the intertwinement standard is satisfied here in both ways.

1
2

### 2.    Plaintiff is bound by the arbitration agreement under estoppel principles.

3      *First*, as explained above, Plaintiff's claims are intertwined with the Grant
4  Agreements. A similar issue was recently the subject of a related case before this Court
5  involving the same Plaintiff. In *Mullis v. J.P. Morgan Chase & Co.*, the Court
6  compelled this same Plaintiff to arbitrate after finding that his claims and damages
7  flowed from his participation in MEP programs obtained through agreements that
8  contained arbitration clauses. 2025 U.S. Dist. LEXIS 102441, at *16. The Court further
9  held that equitable estoppel permitted nonsignatory defendants to enforce the
10 arbitration provisions where Plaintiff's claims against them and alleged injuries were
11 intertwined with the underlying arbitral agreements. *Id*. For the reasons set forth
12 throughout, the same result should obtain here.

13     The Court's prior decision is also supported by *Mousebelt*. In that case, the
14 plaintiff invested more than $300,000 in a crowdsourcing platform, "Knowledgr," in
15 exchange for preferred stock and other interests. *Mousebelt Labs Pte. Ltd.*, 674 F.
16 Supp. 3d at 732. Plaintiff made the investments through agreements with arbitration
17 clauses covering "[a]ll disputes, controversies, or differences arising out of or in
18 connection with" the agreements. *Id.* at 733. Plaintiff later filed suit against several
19 nonsignatories alleging that they conspired with Knowledgr to abandon the company
20 and "annihilate" the value of plaintiff's equity. *Id.* The court compelled arbitration
21 under the Convention and the doctrine of equitable estoppel, holding that the disputes
22 were intertwined with the investment agreements. *Id.* at 740-42. The court observed
23 that the claims were "predicated on allegations that Defendants induced" Knowledgr
24 to "abdicate [its] contractual obligations" to plaintiff, which "obligations existed only
25 by virtue of" the investment agreements. *Id.* at 741. Further, plaintiff's alleged
26 damages hinged on the contractual rights in the investment agreements. *Id*

27     As in those cases, here, the alleged harm "cannot be divorced from" the
28 underlying Grant Agreements. *Id*. Thus, the "subject matter in dispute" is "properly

characterized as intertwined with the contract[s] providing for arbitration" and arbitration must be compelled. *Id.* at 742.

**Second**, Plaintiff also alleges that all Defendants engaged in the purported misconduct together, for which each is jointly and severally liable.[7] Although Defendants dispute this claim, because Plaintiff alleges collusive misconduct between the OEP Signatories and other Defendants without making any attempt to distinguish between the Defendants whatsoever, this is another independent reason Plaintiff is equitably estopped from avoiding arbitration. Otherwise, to allow Plaintiff's "case against [some] defendants to proceed while compelling [his] case against [the OEP Signatories] to arbitration—for the exact same conduct—would render the arbitration agreement ineffective and run contrary to the federal policy favoring arbitration, which applies with special force in the international commercial context." *See Am. Chung Nam, LLC*, 2023 U.S. Dist. LEXIS 227709, at *22 (intertwinement "is satisfied where a signatory 'raises allegations of collusive misconduct between the nonsignatory and other signatories'"). Accordingly, this dispute is "properly characterized as intertwined with the contract[s]" for the additional reason that Plaintiff alleges "collusive misconduct between the nonsignatory and other signatories," and the Court should compel arbitration. *Mousebelt Labs Pte. Ltd.*, 2023 U.S. Dist. LEXIS 97679, at *26.

### 3. The Grant Agreements Are Not Void, Inoperative, or Incapable of Being Performed.

The Grant Agreements are enforceable. Enforceability in this context is not a state law question. *See Chloe Z Fishing Co.*, 109 F. Supp. 2d at 1258-59 ("[I]t is well-

---

[7] *See e.g.*, Compl. at ¶¶ 11-14 (alleging each Defendant acted as "agent, servant, employee, partner, joint venturer, co-conspirator, alter ego" of the others, with knowledge, consent, and ratification); *id.* at ¶¶ 18-20 (alleging a principal of OEP Entities corresponded with Neology director regarding pari passu rights); *id.* at ¶¶ 26-37 (alleging broadly, without parsing, that Defendants terminated Plaintiff, attempted to coerce execution of a separation agreement, denied pari passu rights, coordinated economic harm by underpaying MEP value, and misused Plaintiff's personal credit card).

**DEFS.' MEM. IN SUPPORT OF MOT. TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

established that it is not state law…which makes a valid agreement to arbitrate the
subject of the dispute unenforceable under [the New York] Convention."). Rather,
"[o]nly internationally recognized contract formation defenses or public policy
concerns of the forum nation can render an arbitration agreement unenforceable under
Article II of the Convention." *Mullen Techs., Inc.*, 2020 U.S. Dist. LEXIS 116323, at
*9. Any doubts about "applicable contract defenses[] are to be resolved in favor of
arbitration." *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1022 (9th Cir. 2016).
Accordingly, courts narrowly construe the "null and void" exception, and the burden
to establish such an exception rests with the party opposing arbitration. *See Chloe Z
Fishing Co.*, 109 F. Supp. 2d at 1259; *Rogers v. Royal Caribbean Cruise Line*, 547
F.3d 1148, 1158-59 (9th Cir. 2008).

There can be no argument that the Grant Agreements here are somehow void or
inoperative. They are valid agreements, signed by Plaintiff. *See Tech. & Intellectual
Prop. Strategies Grp. PC v. Insperity, Inc.*, 2012 U.S. Dist. LEXIS 170714, at *38
(N.D. Cal. 2012). Indeed, the very equity rights Plaintiff seeks to assert are grounded
in the validity of the Grant Agreements. Nor is there any reason to believe the Grant
Agreements are otherwise incapable of being performed. An ICC arbitration tribunal
seated in New York will be more than capable of administering the arbitration. Thus,
because the Grant Agreements are not void, inoperative, or incapable of being
performed, the Court should compel arbitration.

**C.    The Court Should Stay the Entire Action Pending Arbitration.**

If the Court compels arbitration, it must also stay this action in its entirety. *See*
9 U.S.C. § 3 ("[T]he court . . . upon being satisfied that the issue involved in such suit
or proceeding is referable to arbitration . . . shall on application of one of the parties
stay the trial of the action until such arbitration has been had in accordance with the
terms of the agreement[.]"); *Kilgore v. KeyBank, N.A.*, 673 F.3d 947, 955 (9th Cir.
2012) (A "federal case must be stayed while the parties proceed to arbitration."),
*reversed and remanded on other grounds*, 718 F.3d 1052 (9th Cir. 2013); *see also*

DEFS.' MEM. IN SUPPORT OF MOT. TO COMPEL ARBITRATION AND STAY PROCEEDINGS

*Smith v. Spizzirri*, 601 U.S. 472, 474 (2024) (the FAA does not permit "a court to dismiss the case instead of issuing a stay when the dispute is subject to arbitration and a party requests a stay pending arbitration."). The stay rule exists because it "would waste judicial resources" if the court "permit[ted] discovery," took evidence and "determine[d] the merits of the case at the same time as the arbitrator is going through a substantially parallel process." *Leyva v. Certified Grocers of Cal. Ltd.*, 593 F.2d 857, 864 (9th Cir. 1979).

This mandatory stay rule also applies to cases under the Convention. *See* 9 U.S.C. § 208 (FAA Chapter 1 applies to actions under FAA 2 to the extent they are not in conflict with one another or the Convention); *Chloe Z Fishing Co.*, 109 F. Supp. 2d at 1261 (finding a stay under FAA Chapter 1 applicable to Chapter 2 cases); *Mullen Techs., Inc.*, 2020 U.S. Dist. LEXIS 116323, at *10 (staying action pending arbitration). Accordingly, once this Court finds that Plaintiff's claims must be arbitrated, the case must be stayed.

While all of Plaintiff's claims are arbitrable, even if the Court determines that some claims are not arbitrable the entire case should be stayed as all the claims are closely related and a stay would avoid duplication of resources and inconsistent findings by the Court and the arbitrator. *See Gsc Dev. v. Jinlong Indus. Co.*, 2017 U.S. Dist. LEXIS 235508, at *7-8 (C.D. Cal. Dec. 4, 2017) ("Since all of the claims in the [Complaint] are so closely connected, proceeding with litigation will prejudice the arbitration and waste judicial resources."); *Translarity, Inc. v. Grand Junction Semiconductor PTE. Ltd.*, 2024 U.S. Dist. LEXIS 196550, at *33 (staying non-arbitrable claims because those claims are intertwined with the arbitrable claims); *Wash. Sch. Risk Mgmt. Pool v. Am. Re-Insurance Co.*, 2023 U.S. Dist. LEXIS 8013, at *14 (staying non-arbitrable claims that "are grounded in identical facts and legal theories" with arbitrable claims); *Wolf v. Langemeier*, 2010 U.S. Dist. LEXIS 87017, at *23 (E.D. Cal. Aug. 24, 2010) ("In light of the similarity of the issues of law and fact among each Plaintiff's claim and the possibility of inconsistent rulings if the entire

1  action is not stayed, the interests of economy and efficiency favor staying this entire

2  action.").

3  **IV.    CONCLUSION**

4        Plaintiff's claims all derive from, are based on, or touch matters governed by

5  the Grant Agreements, which contain broad arbitration provisions covering Plaintiff's

6  claims. The Grant Agreements are subject to the New York Convention, and

7  Defendants are entitled to compel arbitration under the equitable estoppel doctrine.

8  Accordingly, the Court should compel arbitration pursuant to the Grant Agreements

9  and stay this action pending completion of arbitration. 9 U.S.C. §§ 206, 208.

10
                                                Respectfully submitted,

11    DATED:  December 19, 2025

12                                             GLASER WEIL FINK HOWARD
                                             JORDAN & SHAPIRO LLP

13                                          Emil Petrossian
                                        Alexander R. Miller

14
                                        By: */s/ Emil Petrossian*

15                                             Emil Petrossian

16                                          Robert Haney, Jr. (*Pro Hac Vice*

17                                          Application Forthcoming)
                                        FOLEY HOAG LLP

18                                          1301 Avenue of the Americas
                                        New York, NY 10019

19                                          Tel: (212) 812-0399
                                        rhaney@foleyhoag.com

20
21                                          Leah Rizkallah (*Pro Hac Vice*

22                                          Application Forthcoming)
                                        FOLEY HOAG LLP

23                                          155 Seaport Boulevard
                                        Boston, MA 02210

24                                          Tel: (617) 832-1000
                                        lrizkallah@foleyhoag.com

25
26                                          *Attorneys for Defendants*
                                        NEOLOGY, INC., BRADLEY H.

27                                          FELDMANN, OEP CAPITAL
                                        ADVISORS, L.P., OEP NEOLOGY

28                                          CAYMAN, L.P., and OEP VI
                                        GENERAL PARTNER, L.P.

*Glaser Weil*