# EXHIBIT 2

**CONFIDENTIAL SEPARATION AND TRANSITION AGREEMENT
AND GENERAL RELEASE OF ALL CLAIMS**

This Confidential Separation and Transition Agreement and General Release of All Claims ("***Agreement***") is made by and between Neology, Inc. (the "***Company***") and Joe Mullis ("***Employee***"), dated as of September 26, 2022.

WHEREAS,

A.  Employee is party to an employment agreement with the Company (the "***Employment Agreement***"). All capitalized terms used but not defined herein shall have the meanings set forth in the Employment Agreement;

B.  Pursuant to Section 11.2 of the Employment Agreement, Employee's employment may be terminated by the Company without Cause by providing Employee with thirty (30) days' prior written notice or pay in lieu thereof. Due to a reduction in force, Employee's employment with the Company and its affiliates is being terminated without Cause;

C.  Pursuant to Section 11.2 of the Employment Agreement, Employee is entitled to the severance payments and benefits set forth in this Agreement, subject to Employee's execution of this Agreement, including a general release of all claims;

D.  The parties desire to settle all claims and issues that have, or could have been raised, by Employee related to his employment with the Company and the termination thereof, and to all of the acts, transactions, or occurrences between Employee and the Company;

E.  If Employee signs and returns this Agreement in accordance with paragraph 7 below, then this Agreement shall become a binding agreement between Employee and the Company on the date Employee signs this Agreement, and Employee shall receive severance payments and benefits described herein subject to the conditions set forth herein. If Employee does not timely sign and return this Agreement and the general release of claims attached hereto as Exhibit A (the "***Release***") or if Employee revokes the ADEA Waiver (as defined in the Release), Employee shall not be entitled to receive any payments or benefits from the Company, except the Accrued Obligations (defined in paragraph 1.2 below); and

F.  Notwithstanding the foregoing, the parties desire for Employee to continue to provide services to the Company as a consultant, effective October 3, 2022, and have agreed to enter into a Consulting Agreement substantially in the form attached hereto as Exhibit B (the "***Consulting Agreement***"), the effectiveness of which is expressly conditioned upon both the execution of this Agreement and the Release (as defined below) herein becoming effective).

THEREFORE, in consideration of the promises and mutual agreements set forth in this Agreement, Employee and the Company agree as follows:

1.  Separation and Severance Pay.

    1.1 Employee's last day of employment with the Company shall be September 30, 2022 (the "***Separation Date***"). Effective as of the Separation Date, Employee's employment with the Company and its affiliates and the Employment Agreement shall terminate, and Employee shall automatically be deemed to resign from all Employee's positions with the Company and its affiliates without any further action by Employee, the Company, or any of its affiliates.

    1.2 Upon the Separation Date, the Company shall pay to you **(a)** all accrued salary and all accrued, unused paid time off through the Separation Date, **(b)** an aggregate cash payment of US$▇▇▇▇, less all applicable federal and state income and employment taxes, which represents twenty-six (26) days of

Employee's base salary and is paid in lieu of the full thirty (30) day notice period in Section 11.2 of the Employment Agreement and **(c)** any unreimbursed business expenses incurred by you, in accordance with Company policy, prior to the Separation Date (collectively, the "**Accrued Obligations**").

   1.3 Subject to Employee's execution of this Agreement, including the Release, and non-revocation of the ADEA Waiver, the Company shall provide Employee with the following severance benefits: an aggregate cash payment equal to US$███████, which represents six (6) months of Employee's base salary in effect as of the Separation Date, less all applicable federal and state income and employment taxes (collectively, the "**Severance Pay**").  The Severance Pay shall be paid in equal installments in accordance with the Company's regular payroll cycle during the six (6)-month period following the Separation Date, provided that any portion of the Severance Pay otherwise payable between the Separation Date and the Effective Date (as defined in the Release) shall be paid, without interest, on the first payroll date following the Effective Date.

   1.4 Employee acknowledges and agrees that the Severance Pay constitutes adequate legal consideration for the promises and representations made by Employee in this Agreement, including the Release, and Employee would not otherwise be entitled to the Severance Pay. Employee acknowledges that, upon receipt of the Accrued Obligations, Employee has received all monies and other benefits due to Employee as a result of Employee's employment with, and separation from, the Company.

   1.5 Employee shall continue to participate in the Company's health insurance plans as an active employee through September 30, 2022. As of October 1, 2022, Employee may, at Employee's own expense, continue participation in Company's health insurance plans under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**") Employee is entitled to the benefits of COBRA regardless of whether Employee signs this Agreement, and will receive information concerning COBRA coverage following the Separation Date.

   1.6 Except as expressly provided herein or pursuant to the Consulting Agreement, Employee acknowledges that Employee will not receive, nor is entitled to receive, any additional compensation or benefits from the Company. Employee understands and agrees that, regardless of whether assessed to or against Employee or the Company, Employee will be solely responsible for the payment of any taxes and penalties assessed on the Severance Pay set forth herein, including, without limitation, any payment or penalty assessed under the Internal Revenue Code of 1986, as amended, and the regulations and guidance promulgated thereunder (the "**Code**")  Company makes no representations as to the tax treatment or legal effect of the payment called for hereunder, and Employee is not relying on any statement or representation of the Company in this regard.  Further, Employee hereby agrees to defend, indemnify, and hold harmless the Company for any tax liabilities, assessments, or penalties resulting from the payment of the separation funds set forth herein, or for Company's or Employee's alleged failure to make any appropriate or required tax payments, deductions, or assessments with regard thereto.

  2. <u>Other Agreements and Representations</u>.  Employee further agrees: **(a)** not to disparage the Company, its employees, directors, employees, shareholders, and agents, in any manner likely to be harmful to its or their business, business reputations, or personal reputations; **(b)** not to voluntarily (except in response to legal compulsion) assist any third party in bringing or pursuing any proposed or pending litigation, arbitration, administrative claim, or other formal proceeding against the Company, its parent or subsidiary entities, investors, affiliates, employees, directors, employees, or agents; **(c)** to cooperate fully with the Company, by voluntarily (without legal compulsion) providing accurate and complete information, in connection with the Company's actual or contemplated defense, prosecution, or investigation of any claims or demands by or against third parties, or other matters, arising from events, acts, or failures to act that occurred during the period of Employee's employment by the Company; **(d)** acknowledges and reaffirms Employee's continuing obligations under the terms of the Employment Agreement, including without limitation, Sections 8, 9, and 10 of the Employment Agreement (but excluding Sections 8.4 and 8.5 thereof, which, notwithstanding the terms of the Employment Agreement, shall not apply), and the Incentive Partnership Interest Grant Agreements between Employee and the Company, dated May 24, 2018 and March 1, 2022 (each, an "**Incentive Grant Agreement**"), including but not limited to Section 6 of each Incentive Grant Agreement; and **(e)** acknowledges that, for the avoidance of doubt and notwithstanding anything to the contrary in the Incentive Grant Agreements, the General Partner's (as defined in the Incentive Grant Agreements) right to repurchase all or any portion of Employee's vested Executive Units as described in Section 5(a) thereof shall commence upon the expiration of the Consulting Term (as defined in the Consulting

Agreement), and the time period in which the General Partner has the right to deliver the Repurchase Notice (as defined in the Incentive Grant Agreements) to Employee shall commence upon the expiration of the Consulting Term. Nothing in this Agreement, including the Release, prevents Employee from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that the Employee has reason to believe is unlawful. In addition, Employee hereby represents that, as of the Separation Date, Employee will have been paid all wages earned, owed and for all hours worked, Employee has received all the leave and leave benefits and protections for which Employee is eligible, pursuant to FMLA, the California Family Rights Act, or any applicable law or Company policy. Employee agrees and acknowledges that by this Agreement, Employee has been advised to consult with an attorney before executing this Agreement and has been given at least five (5) business days to do so, although Employee may sign it sooner if desired, and has consulted with such counsel as Employee believed was necessary before signing this Agreement.

Notwithstanding the foregoing, nothing herein shall restrict Employee from responding to a valid subpoena, nor shall Employee be prohibited from communicating with any government agency, including your right to communicate directly with the U.S. Securities and Exchange Commission, the U.S. Commodity Futures Trading Commission, the U.S. Department of Justice, or similar agency, or to cooperate with or participate in any investigation conducted by such agency or to make any other disclosures that are protected under the whistleblower provisions of applicable law. For the avoidance of doubt, Employee does not need to notify or obtain the prior authorization of the Company to exercise any of the foregoing rights. Further, Employee understands that: (i) Employee will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law; (ii) Employee will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; and (iii) if Employee files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Employee may disclose trade secrets to Employee's attorney and use the trade secret information in the court proceeding if Employee: (x) files any document containing the trade secret under seal; and (y) does not disclose the trade secret, except pursuant to court order.

3. <u>Return of Company Property</u>. Employee understands and agrees that as a condition of entering into this Agreement and eligibility to receive the Severance Pay in paragraph 1.3, all Company property still in Employee's possession, if any, must be returned to the Company no later than the Separation Date, excluding any laptop or phone provided to Employee by the Company, which shall be required to be returned upon the completion of the Consulting Term, and notwithstanding Section 9.4 of the Employment Agreement. By signing this Agreement, Employee represents and warrants that Employee has or will have returned all such Company property required to be returned pursuant to this paragraph 3 and otherwise complied with Section 9.4 of the Employment Agreement no later than the Separation Date.

4. <u>Confidentiality of This Agreement</u>. In addition, Employee agrees to keep the terms of this Agreement and the Consulting Agreement confidential, and will not discuss it with any other employee of the Company or any of its related entities (other than Neology Human Resources), except that Employee may confidentially tell Employee's spouse and attorney or accountant, if any, as needed for legal or tax advice, but Employee must not discuss this Agreement, the Consulting Agreement, or any of their terms with any current employees of the Company. This confidentiality provision is not intended to apply to truthful statements made under oath in a court of law, or as otherwise required by law.

5. <u>No Admissions</u>. By entering into this Agreement, the Company and the other Released Parties (as defined in the Release) make no admission that they have engaged, or are now engaging, in any unlawful conduct. The parties understand and acknowledge that this Agreement is not an admission of liability or any wrongdoing, and shall not be used or construed as such in any legal or administrative proceeding.

6. <u>Section 409A</u>. This Agreement is intended to satisfy or be exempt from the requirements of Section 409A of the Code and Department of Treasury regulations and other interpretive guidance issued thereunder, including without limitation any such regulations or other such guidance that may be issued after the Effective Date (collectively, "**Section 409A**"), and shall be administered and interpreted accordingly. Each payment under this Agreement or any Employer benefit plan is intended to be treated as one of a series of separate payments for purposes of Section 409A and Treasury Regulation §1.409A-2(b)(2)(iii) (or any similar or successor

provisions). If as of the Separation Date Employee is a "specified employee" under Section 409A(a)(2)(B)(i) and any applicable policy of the Company, then any payment under this Agreement that is treated as deferred compensation under Section 409A payable upon termination of Employee's employment shall be delayed until the date which is six (6) months after the date of Employee's "separation from service" as determined under Section 409A (without interest or earnings). To the extent that payments under this Agreement are payments under a "reimbursement plan" subject to Section 409A, the right to reimbursement may not be exchanged for cash or any other benefit, the amount of expenses eligible for reimbursement in one calendar year shall not affect the expenses eligible for reimbursement in any other calendar year, and the reimbursement of any eligible expense shall be made pursuant to the Company's normal policies and procedures for expense reimbursement, which shall be in any event no later than the last day of the calendar year following the calendar year in which the expense was incurred.

7. <u>Return of Agreement</u>. Once Employee reviews and signs this Agreement, Employee must deliver it to Susan Peabody, Human Resources, via email at speabody@neology.net or via mail at Neology, Inc., 13520 Evening Creek Drive North, Suite 460, San Diego, California 92128, no later than November 30, 2022, for signature by the Company. Once this Agreement and the Release are fully executed and not revoked pursuant to paragraph 3 of the Release, the Severance Payment shall then become due and payable in accordance with paragraph 1.3 of this Agreement.

8. <u>Employment Reference</u>. Company agrees, upon request from Employee, to provide a neutral employment reference for Employee, in accordance with standard company policy that will include only verification of employment with Company, dates of employment, positions held, and confirmation of salary.

9. <u>Full Defense</u>. This Agreement may be pled as a full and complete defense to, and may be used as a basis for an injunction against, any action, suit, or other proceeding that may be prosecuted, instituted, or attempted by Employee in breach hereof.

10. <u>Severability</u>. In the event any provision of this Agreement shall be found unenforceable, the unenforceable provision shall be deemed deleted and the validity and enforceability of the remaining provisions shall not be affected thereby.

11. <u>Applicable Law</u>. The validity, interpretation, and performance of this Agreement, including the Release, shall be construed and interpreted according to the laws of the United States of America and the State of California.

12. <u>Entire Agreement; Modification; Waiver</u>. This Agreement, including the Release, and the Consulting Agreement are intended to be the entire agreement between the parties and supersedes and cancels any and all other and prior agreements, written or oral, between the parties regarding this subject matter. The parties agree that no waiver, amendment, or modification of any of the terms of this Agreement shall be effective unless in writing and signed by all parties affected by the waiver, amendment, or modification. No waiver of any term, condition, or default of any term of this Agreement shall be construed as a waiver of any other term, condition, or default.

[*Remainder of page intentionally left blank*]

THE PARTIES TO THIS AGREEMENT HAVE READ THE FOREGOING AGREEMENT AND FULLY UNDERSTAND EACH AND EVERY PROVISION CONTAINED HEREIN.  WHEREFORE, THE PARTIES HAVE EXECUTED THIS AGREEMENT ON THE DATES SHOWN BELOW.


Dated: _____   By: _____
                                       Joe Mullis


                                   **Neology, Inc.**


Dated: _____   By: _____
                                       Bradley H. Feldmann, Chairman & CEO

**EXHIBIT A**

**GENERAL RELEASE AGREEMENT**

This General Release of Claims (this "***Release***") is made by Joe Mullis ("***Employee***") in favor of Neology, Inc. (the "***Company***"), and the "***Releasees***" (as defined below), as of the date of Employee's execution of this Release. All capitalized terms used but not defined herein shall have the meanings set forth in the Confidential Separation and Transition Agreement and General Release of All Claims ("***Separation Agreement***") between Employee and the Company, dated September 26, 2022.

1. General Release. In exchange for the consideration described in paragraph 1.3 of the Separation Agreement, which Employee is not otherwise entitled to receive, Employee hereby generally and completely releases, acquits, and forever discharges the Company and its parent, subsidiary, affiliated entities, and investors, along with its and their predecessors and successors and their respective directors, employees, officers, associates, members, representatives, shareholders, stockholders, employee benefit plans, partners, agents, attorneys, insurers, owners, affiliates, and assigns and all persons acting by, through, under, or in concert with them (collectively, the "***Released Parties***"), of and from any and all claims, actions, causes of actions, demands, liabilities, and obligations of any kind or nature which the Employee may now have or ever have, whether known or unknown, fixed or contingent, that arise from or are in any way related to events, acts, conduct, or omissions occurring at any time prior to and including the date that Employee signs this Release (collectively, the "***Released Claims***"). The Released Claims include, but are not limited to: **(a)** all claims arising out of or in any way related to Employee's employment with the Company, or the termination of that employment; **(b)** all claims related to Employee's compensation or benefits from the Company, including salary, bonuses, commissions, other incentive compensation, vacation pay and the redemption thereof, expense reimbursements, fringe benefits, stock, stock options, or any other ownership or equity interests in the Company; **(c)** all claims for breach of contract, wrongful termination, and breach of the implied covenant of good faith and fair dealing; **(d)** all tort claims, including but not limited to claims for fraud, defamation, emotional distress, and discharge in violation of public policy; and **(e)** all federal, state, and local statutory claims, including but not limited to claims for discrimination, harassment, retaliation, attorneys' fees, penalties, or other claims arising under Title VII of the Civil Rights Act of 1964 (as amended), the federal Americans with Disabilities Act of 1990 (as amended), the federal Equal Pay Act, the federal Age Discrimination in Employment Act of 1967 (as amended) (the "***ADEA***"), the federal Family and Medical Leave Act ("***FMLA***"), the Older Workers' Protection Benefits Act of 1990, the False Claim Act, the Employee Retirement Income Security Act of 1974 (as amended), the federal Worker Adjustment and Retraining Notification Act (as amended), the federal Fair Labor Standards Act, the California Labor Code (as amended), the California Equal Pay Law (as amended), the California WARN Act, the California False Claims Act, the California Corporate Criminal Liability Act, the California Family Rights Act, and the California Fair Employment and Housing Act (as amended).

2. Excluded Claims. Notwithstanding the foregoing, the following are not included in the Released Claims (the "***Excluded Claims***"): **(a)** any rights or claims for indemnification Employee may have pursuant to any written indemnification agreement with the Company to which Employee is a party, the Company's bylaws, or applicable law; **(b)** any rights which are not waivable as a matter of law; **(c)** any rights or claims for benefits that Employee may have under a professional or directors and officers insurance policy purchased by the Company or its affiliates; and **(d)** any rights that Employee may have to unreimbursed business expenses under the Company's expense reimbursement policy or accrued but unused personal time off benefits, any vested rights that Employee may have under the Company 401(k) plan (or similar plan designed for retirement), the Consolidated Omnibus Budget Reconciliation Act of 1985 or the state equivalent, and any rights that Employee may have under the Incentive Grant Agreements. In addition, nothing in this Release prevents Employee from filing, cooperating with, or participating in any investigation or proceeding before the Equal Employment Opportunity Commission, the Department of Labor, the California Department of Fair Employment and Housing, or any other government agency, except that Employee hereby waives Employee's right to any monetary benefits in connection with any such claim, charge, investigation, or proceeding. Employee hereby represents and warrants that, other than the Excluded Claims, Employee is not aware of any claims Employee has or might have against any of the Released Parties that are not included in the Released Claims.

   3. <u>ADEA Waiver</u>.  Employee acknowledges that Employee is knowingly and voluntarily waiving and releasing any rights Employee may have under the ADEA ("***ADEA Waiver***").  Employee also acknowledges that the consideration given for the ADEA Waiver is in addition to anything of value to which Employee was already entitled. Employee further acknowledges that Employee is advised by this writing, as required by the ADEA, that: **(a)** this ADEA Waiver does not apply to any rights or claims that arise after the date Employee signs this Release; **(b)** Employee should consult with an attorney prior to signing this Release; **(c)** <u>Employee has sixty (60) days following the Separation Date to consider whether to sign this Release (such period, the "**Consideration Period**"), which Employee acknowledges is longer than twenty-one (21) days following Employee's original receipt of the Separation Agreement on September 26, 2022, to which this Release is attached (although Employee may choose to voluntarily sign it sooner);</u> **(d)** such Consideration Period shall not be extended due to any material or immaterial changes to the Separation Agreement or this Release; **(e)** <u>Employee has seven (7) days following the date Employee signs this Release to revoke it by providing written notice to the Company</u>; and **(f)** this Release will not be effective until the date upon which the revocation period has expired unexercised, which will be the eighth (8th) day after Employee signs this Release ("***Effective Date***").

   Employee acknowledges that Employee has received with this Release all of the information required by the ADEA, including without limitation a detailed list of the job titles and ages of all employees who were terminated as part of the group termination program affecting Employee, and the ages of all employees of the Company in the same job classification or organizational unit who were not terminated, along with information on the eligibility factors used to select employees for the group termination program and any time limits applicable to the group termination program, attached as Schedule 1 to this Release.

   4. <u>Section 1542 Waiver</u>.  In signing the Release, which includes claims which may be unknown to Employee at present, Employee acknowledges that Employee has read and understands Section 1542 of the California Civil Code, which reads as follows:  **"A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."**  Employee hereby expressly waives and relinquishes all rights and benefits under Section 1542 of the California Civil Code and any law of any other jurisdiction of similar effect with respect to Employee's release of claims, including but not limited to any unknown or unsuspected claims herein.

   5. <u>Miscellaneous</u>.

   (a) *No Admission*.  Employee understands and agrees that neither the payment of money nor the execution of this Release shall constitute or be construed as an admission of any liability whatsoever by the Releasees.

   (b) *Severability*.  If any sentence, phrase, section, subsection, or portion of this Release is found to be illegal or unenforceable, such action shall not affect the validity or enforceability of the remaining sentences, phrases, sections, subsections, or portions of this Release, which shall remain fully valid and enforceable.

   (c) *Headings*.  The headings in this Release are provided solely for convenience, and are not intended to be part of, nor to affect or alter the interpretation or meaning of, this Release.

   (d) *Construction of Agreement*.  Employee has been represented by, or had the opportunity to be represented by, counsel in connection with the negotiation and execution of this Release.  Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Release.

   (e) *Entire Agreement/Integration*. This Release, together with the Separation Agreement, constitutes the entire agreement between Employee and the Company concerning the subject matter hereof.  No covenants, agreements, representations, or warranties of any kind, other than those set forth herein, have been made to any party hereto with respect to this Release.  All prior discussions and negotiations have been and are merged and integrated into, and are superseded by, this Release.  No amendments to this Release will be valid unless written and signed by Employee and an authorized representative of the Company.

**Once Employee reviews and signs this Release, Employee must deliver it to Susan Peabody, Human Resources, via email at speabody@neology.net or via mail at Neology, Inc., 13520 Evening Creek Drive North, Suite 460, San Diego, California 92128 on or after the Separation Date but no later than sixty (60) days after September 30, 2022. If Employee wishes to revoke this Release, Employee shall deliver written notice stating Employee's intent to revoke this Release to Ms. Peabody (at the email or address above) on or before 5:00 p.m. Pacific Time on the seventh (7th) day after the date on which Employee signs this Release.**

Date:_____     _____

Joe Mullis

A-3

**EXHIBIT B**
**CONSULTING AGREEMENT**
[To Be Included]

## SCHEDULE 1

The Older Workers' Benefit Protection Act requires that the Company provide the following information concerning the group termination program affecting you:

**Eligibility Criteria**

The Company used the following eligibility criteria in selecting employees for the group termination program: whether the employee's position and duties are duplicative of and/or overlap existing positions and/or functions within Company, and whether the Company has a need for additional capacity with respect to employee's position, functions and location.

**Employees Selected and Not Selected for the Program**

A. The decisional unit for the group termination program affecting you consists of all individuals working for Neology, Inc.., and its wholly-owned subsidiaries, in the United States. Individuals within the decisional unit selected for the reduction-in-force announced July 6, 2022, who are eligible for this program, are listed below by job title and age:

| Job Title | Age |
|---|---|
| Associate Solution Architect | 33 |
| CFO | 61 |
| Global Marketing Manager | 52 |
| General Manager | 50 |
| Proposal Writer | 43 |
| Quality Supervisor | 62 |
| Quality Technician | 68 |
| Sr. Software Developer | 54 |
| SVP Sales & Strategy | 59 |
| Technical Writer | 44 |

B. Individuals in the decisional unit who were not selected for the reduction-in-force announced on July 6, 2022, are listed below by job title and age:

| Job Title | Age |
|---|---|
| ADV HARDWARE TECHNOLOGIST | 64 |
| ADVANCED HARDWARE DEV ENG | 59 |
| ALPR SUPPORT TIER 1 LEAD | 57 |
| APPLICATION DEVELOPMENT | 54 |
| AR SPECIALIST | 50 |
| Accounting Manager | 49 |
| Asset Control and I&M Tech I | 26 |
| BUILDING AND LOGISTICS SPECIALIST | 42 |
| BUSINESS DEVELOPMENT MANAGER | 59 |
| CEO | 58 |
| DESIGN ENGINEER | 53 |
| DIRECTOR ALPR R&D | 43 |

US-LEGAL-11512959  160067-0007

| | |
|---|---|
| DIRECTOR OF SOFTWARE | 50 |
| EASTERN SALES REP | 64 |
| FIELD ENGINEER | 48 |
| FIELD ENGINEER | 35 |
| FP&A MANAGER | 33 |
| GLOBAL MARKETING MANAGER | 52 |
| Inside Sales | 51 |
| INSTALLATION & MAINT TECH | 43 |
| INSTALLATION & MAINT TECH | 33 |
| INSTALLATION & MAINT TECH | 30 |
| LEAD SYSTEM DESIGN ENG | 45 |
| MACHINE OPERATOR | 54 |
| MACHINE OPERATOR | 42 |
| MACHINE OPERATOR | 42 |
| MACHINE OPERATOR | 39 |
| MACHINE OPERATOR | 33 |
| MACHINE OPERATOR | 30 |
| MACHINE OPERATOR | 27 |
| MACHINE OPERATOR | 62 |
| MANUFACTURING LEAD | 41 |
| MANUFACTURING MACHINE TECH | 45 |
| MANUFACTURING SUPERVISOR | 40 |
| MANUFACTURING TECHNOLOGIST | 46 |
| MATERIALS MANAGER | 61 |
| OFFICE MANAGER | 69 |
| OPERATIONS MANAGER | 50 |
| PROCESS ENGINEER | 64 |
| PROGRAM MANAGER | 65 |
| PROGRAM MANAGER | 56 |
| QUALITY TECHNICAL ASSURANCE | 29 |
| SALES OPS MGR | 37 |
| SENIOR EMBEDDED SOFTWARE ENGINEER | 66 |
| SOFTWARE DEVELOPER | 58 |
| SOFTWARE DEVELOPER 1 | 41 |
| SOFTWARE DEVELOPER 2 | 55 |
| SOFTWARE ENGINEER | 65 |
| SOLUTION ARCHITECT RFID | 60 |
| SPEC HARDWARE DEV ENG | 65 |
| SR FIELD ENGINEER | 49 |
| SR SOFTWARE DEVELOPER | 55 |

| | |
|---|---|
| SR SOFTWARE DEVELOPER | 44 |
| SR STAFF ACCOUNTANT | 42 |
| SUPERVISOR INSTALLATION & MAINTENANCE TECH | 45 |
| SUPPORT SPECIALIST | 42 |
| Senior VP of Finance | 54 |
| Senior Vice President Development & Sales | 64 |
| Software Development Mgr | 47 |
| TECHNICAL SALES ENG | 65 |
| TECHNICAL SERVICE ENG | 51 |
| TECHNICAL SERVICE MANAGER | 65 |
| TECHNICAL SUPERVISOR | 62 |
| TOLLING FIELD ENGINEER | 27 |
| TOLLING FIELD TECHNICIAN | 43 |
| TOLLING SITE MANAGER | 40 |
| VP OF R&D | 43 |